IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| LEAF123, INC. (F/K/A NATROL, INC.), et al., | Case No. 14-11446 (BLS) |
| Debtors. | (Jointly Administered) |

| | |
|---|---|
| NATROL LLC | |
| Plaintiff | |
| vs. | |
| PLETHICO PHARMACEUTICALS LIMITED, PLETHICO GLOBAL HOLDINGS B.V., PLETHICO US HOLDINGS KFT, LEAF123, INC. (F/K/A NATROL, INC.), LEAF123 HOLDINGS, INC. (F/K/A NATROL HOLDINGS, INC.), LEAF123 PRODUCTS, INC. (F/K/A NATROL PRODUCTS, INC.), LEAF123 DIRECT, INC. (F/K/A NATROL DIRECT, INC.), LEAF123 ACQUISITION CORP. (F/K/A NATROL ACQUISITION CORP.), LEAF123 NUTRITION, INC. (F/K/A PROLAB NUTRITION, INC.), AND LEAF123 RESEARCH INSTITUTE (F/K/A MEDICAL RESEARCH INSTITUTE), | Adv. Pro. No. 15-_____ (BLS) |
| Defendants. | |

**COMPLAINT FOR (I) FRAUDULENT INDUCEMENT THROUGH INTENTIONAL MISREPRESENTATION (FRAUD IN FACT), (II) FRAUDULENT INDUCEMENT THROUGH INTENTIONAL MISREPRESENTATION (PROMISSORY FRAUD), (III) FRAUDULENT INDUCEMENT THROUGH FRAUDULENT CONCEALMENT, (IV) REIMBURSEMENT FOR ILLEGAL CONSTRUCTION CONTRACT UNDER CALIFORNIA BUSINESS & PROFESSIONS CODE 7031(B), (V) RESCISSION AND RESTITUTION, (VI) FRAUD AND DECEIT, (VII) VIOLATION OF 18 U.S.C. § 1962(C) (RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS), (VIII) INTENTIONAL FRAUDULENT TRANSFER UNDER 11 U.S.C. § 548(a)(1)(A), (IX) INTENTIONAL FRAUDULENT TRANSFER UNDER 11 U.S.C. § 544(b) AND CAL. CIV. CODE §§ 3439.04(a) AND 3439.07, (X) CONSTRUCTIVE FRAUDULENT TRANSFER**

**UNDER 11 U.S.C. § 548(a)(1)(B), (XI) CONSTRUCTIVE FRAUDULENT TRANSFER UNDER 11 U.S.C. § 544(b) AND CAL. CIV. CODE §§ 3439.05 AND 3439.07, (XII) LIABILITY OF TRANSFEREE OF AVOIDED TRANSFER UNDER 11 U.S.C. § 550(a)**

_____

Plaintiff Natrol LLC ("New Natrol") by and through its attorneys, Gibson, Dunn & Crutcher LLP and Richards, Layton & Finger, P.A., for its Complaint against Defendants Plethico Pharmaceuticals Limited ("Plethico"), Plethico Global Holdings B.V. ("PGH"), and Plethico US Holdings Kft. ("PUSH") (collectively, the "Plethico Defendants"), as well as the following defendants solely for purpose of effectuating injunctive relief:  Leaf123, Inc. (f/k/a Natrol, Inc.); Leaf123 Holdings, Inc. (f/k/a Natrol Holdings, Inc.); Leaf123 Products, Inc. (f/k/a Natrol Products, Inc.); Leaf123 Direct, Inc. (f/k/a Natrol Direct, Inc.); Leaf123 Acquisition Corp. (f/k/a Natrol Acquisition Corp.); Leaf123 Nutrition, Inc. (f/k/a Prolab Nutrition, Inc.); and Leaf123 Research Institute (f/k/a Medical Research Institute) (collectively, the "Debtors"), hereby alleges as follows:

## PRELIMINARY STATEMENT

1.       New Natrol's parent, Aurobindo Pharma USA Inc. ("Aurobindo"), purchased substantially all of the assets of Leaf123, Inc. (f/k/a Natrol, Inc.) and its subsidiaries (collectively, "Old Natrol") through an asset purchase agreement ("APA") and auction supervised and approved by this Court, and thereafter assigned such assets to New Natrol.  The purchase price of $132.5 million in cash (plus assumed liabilities) exceeded all reasonable expectations at the outset of Old Natrol's bankruptcy case, pays off all creditors, and provides a substantial recovery to equity for the Plethico Defendants.

2.       Pursuant to the APA and related side agreements, New Natrol acquired all of Old Natrol's assets, except for certain delineated "Excluded Assets" as defined in the APA (collectively, the "Purchased Assets").  The Purchased Assets included (1) a contract between Old Natrol and Fabtech Technologies International Limited executed on March 6,

2

2013 (the "Fabtech Contract"), pursuant to which Old Natrol had prepaid $25 million for a "turnkey" construction project to install four new manufacturing lines related to Old Natrol's manufacture of vitamins and nutraceuticals, and (2) all claims (including causes of action and rights of recovery of whatever kind or description, including avoidance actions) arising out of or relating to the Fabtech Contract.

3.      Since New Natrol acquired the Purchased Assets, there has been no performance under the Fabtech Contract.  Consequently, New Natrol conducted an investigation and discovered that the Fabtech Contract is a fraud—an elaborate scheme engineered by the Plethico Defendants to defraud Old Natrol at the time the contract was entered into in March 2013, and to continue such fraud on New Natrol and this Court during the bankruptcy process.  As a result of that fraud, New Natrol acquired a contract that was pure fiction.  The Plethico Defendants engineered the fraud through a classic phony vendor scheme, causing Old Natrol to enter into the sham construction contract with a fake company purportedly located in Singapore, using the name of a legitimate Indian engineering and construction company with no Singapore office that was chosen to mask the Plethico Defendants' deception.

4.      Pursuant to the sham contract, the Plethico Defendants caused Old Natrol to wire $25 million to an overseas account at a private bank Plethico has used for its own company accounts.  Later, during the bankruptcy sale process and as a fraud on this Court, Plethico created and used dummy email accounts purportedly associated with the real Fabtech to give the appearance during Old Natrol's bankruptcy case that the real Fabtech intended to perform under the contract.

5.      For most of the Old Natrol bankruptcy case, nothing happened under the Fabtech Contract except a series of email exchanges between Old Natrol and made-up Fabtech employees using the dummy Fabtech email accounts designed to indicate that Fabtech intended to perform under the contact.  These messages, as New Natrol has recently discovered, originated from an Internet Protocol ("IP") address associated with

3

*Plethico*.  During the sale process supervised by this Court, however, Plethico arranged for equipment to be shipped to Old Natrol and represented under false identities that such equipment was from the real Fabtech as part of its obligations under the Fabtech Contract.

6.       The truth, however, is the following:  the real Fabtech never executed the Fabtech Contract; the real Fabtech never used the dummy Fabtech email accounts; the real Fabtech never employed the fictional employees who used those dummy accounts; the real Fabtech never sent any equipment to Old Natrol; and the real Fabtech never received the $25 million payment from Old Natrol.  The Plethico Defendants orchestrated everything— from the sham Fabtech Contract, to the subsequent two-year long cover-up and attempted manipulation of this Court during the bankruptcy process.

## JURISDICTION AND VENUE

7.       This is an adversary proceeding pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure.

8.       This Court has original jurisdiction under 28 U .S.C. § 1334(b) in that this civil proceeding relates to the underlying cases under title 11 of the United States Code (the "Bankruptcy Code") and it alleges claims arising under the Bankruptcy Code.

9.       This adversary proceeding is a "core" proceeding pursuant to 28 U.S.C. § 157(b).  Pursuant to Local Rule 7008-1, Plaintiff hereby consents to the entry of final orders or judgments by this Court.

10.       This Court has personal jurisdiction over Defendants pursuant to Rule 7004 of the Federal Rules of Bankruptcy Procedure.

11.       Venue of this adversary proceeding in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409(a).

12.       The Plethico Defendants have used the jurisdiction of the bankruptcy court to perpetuate and profit from their fraud.

13.     After the Plethico Defendants caused Old Natrol to enter into the Fabtech Contract and to divert $25 million from Old Natrol to the Plethico Defendants, Old Natrol's secured lender Cerberus Business Finance LLC ("Cerberus") took actions to enforce its rights.

14.     As part of its plan to conceal and profit from its fraud, the Plethico Defendants then caused Old Natrol to commence this bankruptcy case by the filing of a voluntary chapter 11 petition, thereby invoking the jurisdiction of the Bankruptcy Court to obtain the benefit of the automatic stay to stave off enforcement action by Cerberus.

15.     Post petition, the Plethico Defendants caused Old Natrol to use this Court's jurisdiction to implement a sale process to secure a buyer for Old Natrol's assets "free and clear" of claims pursuant to Section 363 of the Bankruptcy Code, thereby maximizing the proceeds paid, a significant portion of which Old Natrol now proposes to distribute to the Plethico Defendants pursuant to a plan of liquidation.

16.     The *Order (A) Approving Asset Purchase Agreement Between Debtors and Buyer; (B) Authorizing the Sale of Substantially All of the Debtors' Assets Free and Clear of Liens, Claims, Encumbrances and Interests; (C) Authorizing the Assumption, Assignment, and Sale of Certain Executory Contracts and Unexpired Leases; and (D) Granting Certain Related Relief* [Bk. D.I. 709] ("Sale Order') approved the sale of Old Natrol's assets to New Natrol as follows:

> The Court shall retain jurisdiction and power to, among other things, interpret, implement, and enforce the terms and provisions of this Sale Order and the Purchase Agreement, all amendments thereto and any waivers and consents thereunder, *and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale*, <u>including</u> retaining jurisdiction to (a) compel delivery of the Assets to the Buyer in accordance the Purchase Agreement, (b) interpret, implement and enforce the provisions of this Sale Order, (c) protect the Buyer against any Interests in or against the Debtors or the Assets of any kind or nature whatsoever, and (d) enter any orders under sections 363 or 365 of the Bankruptcy Code with respect to the Assets and Assigned Contracts.

Sale Order ¶ 45 (emphasis added).

17.     The claims for relief alleged in this Complaint concern and relate to the sale approved in the Sale Order.

## THE PARTIES

18.     Plaintiff New Natrol is a company organized and existing under the laws of the State of Delaware, with its principal place of business and headquarters in Chatsworth, California.  New Natrol is a leading vitamin and nutritional supplement manufacturer whose products are distributed and sold throughout the world.  New Natrol is a wholly-owned subsidiary of Aurobindo and the owner of the Purchased Assets.  Specifically, by the APA, dated November 10, 2014, and related side agreements thereto, between and among Old Natrol, Aurobindo, and various other entities, New Natrol was assigned all claims of Old Natrol pertaining to the Fabtech Contract and claims for avoidance of certain fraudulent conveyances or transfers, including all the claims asserted herein.  New Natrol is therefore entitled to bring these claims as assignee of Aurobindo.

19.     Defendant Plethico is a company organized and existing under the laws of India, with its principal place of business and headquarters in Mumbai, India.  At all times relevant to the events alleged herein, Plethico was the 100% controlling shareholder of Old Natrol through two intermediate, wholly-owned subsidiary holding companies, Defendants PGH and PUSH.  According to Plethico's filings in this bankruptcy proceeding, Plethico is the "sole equity holder" of Old Natrol and "stands to receive any funds remaining after unsecured creditors are paid in full."  Plethico officers served as directors of Old Natrol, with one also serving as Old Natrol's CEO, thereby allowing them to control Old Natrol.  Those officers attended board and other meetings in California and New York.

20.     Defendant PGH is a holding company organized and existing under the laws of the Netherlands.  Plethico owns 100% of PGH, which in turn owns 75% of Old Natrol.  Upon information and belief, PGH has no operations and is simply a shell company

through which Plethico conducted Old Natrol's business operations as well as for purposes of corporate taxes and financing.  PGH is simply an alter ego of Plethico.

21.      Defendant PUSH is a company organized and existing under the laws of Hungary.  Defendant PGH owns 100% of PUSH, which in turn owns the remaining 25% of Old Natrol.  Upon information and belief, PUSH has no operations and is simply a shell company through which Plethico conducted Old Natrol's business operations as well as for purposes of corporate taxes and financing.  PUSH is also simply an alter ego of Plethico.

22.      The Debtors—Defendants Leaf123, Inc. (f/k/a Natrol, Inc.), Leaf123 Holdings, Inc. (f/k/a Natrol Holdings, Inc.), Leaf123 Products, Inc. (f/k/a Natrol Products, Inc.), Leaf123 Direct, Inc. (f/k/a Natrol Direct, Inc.), Leaf123 Acquisition Corp. (f/k/a Natrol Acquisition Corp.), Leaf123 Nutrition, Inc. (f/k/a Prolab Nutrition, Inc.), and Leaf123 Research Institute (f/k/a Medical Research Institute)—all had principal offices located at 21411 Prairie Street, Chatsworth CA 91311 and still have their principal offices in California.

23.      Old Natrol was a legitimate and successful company long before the Plethico Defendants entered the picture.  Old Natrol was founded in 1980 and operated as a diversified nutrition company manufacturing and marketing premium-branded nutritional products.  As a public company, Natrol marketed more than 200 nutritional products designed to meet a wide range of consumer needs.  The products were available at more than 50,000 food, drug, mass market and independent health food stores, catalogs and Internet sites, gyms, and specialty stores both in the United States and in foreign countries.

24.      Prior to its acquisition by Plethico, Old Natrol was a thriving standalone entity.  It reported $57.5 million in net sales and $24.1 million in gross profits for the nine months ended September 30, 2007 (increases of 16.9% and 16.1% over the same period in the previous year, respectively).

RLF1 11775832v.1

25.     Plethico acquired Old Natrol for approximately $80 million in a general tender offer and cash-out merger announced in November 2007 and completed in December 2007.

26.     The several Debtors are named only as nominal parties in order to give effect to the injunctive relief requested in this Complaint.  New Natrol does not allege any wrongdoing by any Debtor defendant or seek any recovery from the Debtors' estates that would otherwise be distributed to any creditor or party in interest other than any Plethico Defendant or successor or assignee of the equity interest or rights of any Plethico entity in Old Natrol.  Nor does New Natrol seek to otherwise diminish any distribution to any creditor or party in interest other than any Plethico Defendant or successor assignee of the equity interest or rights of any Plethico entity in Old Natrol.

## FACTUAL ALLEGATIONS

### The Fraudulent $25 Million Fabtech Contract

27.     The Plethico Defendants' fraud scheme targeted the anticipated receipt by Old Natrol of approximately $75 million in cash liquidity in March 2013 as a result of a loan Old Natrol obtained from Cerberus.

28.     On March 5, 2013, following an extended search by Old Natrol for financing sources for its operations, Old Natrol and Cerberus executed a financing agreement (the "Cerberus Financing"), pursuant to which Old Natrol borrowed $75 million to fund ongoing and planned business operations.

29.     Under the terms of the Cerberus Financing, Cerberus (through a syndicate of affiliates and other parties) advanced $65 million under a term loan and made available an additional $10 million revolving credit facility.

30.     As collateral for the loan, Old Natrol granted a continuing security interest in its assets pursuant to a Pledge and Security Agreement dated March 5, 2013.  These funds—constituting more than $75 million in liquidity held by the Plethico Defendants'

controlled subsidiary, Old Natrol—represented a literal pot of gold that was the target of the Plethico Defendants' fraud.

31.     The Cerberus Financing included typical provisions preventing dividends and distributions to Old Natrol's equity holders, the Plethico Defendants, while the funds advanced by Cerberus were outstanding.

32.     As evident through its contemporaneous and subsequent conduct, the Plethico Defendants had no intention to abide by these restrictions preventing them from accessing Old Natrol's borrowed funds and, in fact, intended to violate them immediately.

33.     To take advantage of Old Natrol's sudden cash influx, the Plethico Defendants undertook an elaborate fraud scheme involving a sham vendor contract that the Plethico Defendants fabricated to expropriate Old Natrol funds on an expedited basis.

34.     The centerpiece of this fraud was the $25 million Fabtech Contract, entitled "Contract for Turnkey Design/Build Construction and Related Services," entered into between Old Natrol and an entity identified as "Fabtech Technologies International Limited," purportedly "registered under the laws of Singapore" (the "Fabtech Contract").

35.     The Fabtech Contract made it appear as if Old Natrol was spending $25 million on a long-term capital expenditure project to be undertaken by Fabtech to provide Old Natrol with four new in-house manufacturing lines.

36.     The Fabtech Contract bore the name and logo of Fabtech Technologies International Limited ("FTIL"), a legitimate Indian engineering company headquartered in Mumbai, India, which promotes itself on its website as providing "turnkey solutions" to the pharmaceutical, biotechnology, and healthcare industries.

37.     In reality, FTIL had nothing to do with the Fabtech Contract; the contract was a fiction created by the Plethico Defendants to resemble an actual contract with a real counterparty (FTIL) so that the Plethico Defendants could use their control over Old Natrol to abscond with $25 million in Old Natrol funds simultaneously obtained as a result of the Cerberus Financing.

38.     Although the Fabtech Contract contemplated the design and construction of new manufacturing lines for and at Old Natrol, Plethico's General Counsel, Devdutt Dhikle ("Dhikle"), and Plethico's current CEO, Chirag Patel ("C. Patel"), who at the time was serving by Plethico's designation as Old Natrol's CEO, arranged for its execution date to be the day after Old Natrol finalized the Cerberus Financing.

39.     Dhikle and C. Patel, as directors of Old Natrol, were in a unique position to manipulate Old Natrol on behalf of the Plethico Defendants.

40.     C. Patel, in fact, as the son of Plethico's Chairman, Shashikant Patel ("S. Patel"), and Plethico's designated CEO of Old Natrol, had unquestioned ability to direct the swift execution of the Fabtech Contract and the resulting immediate $25 million wire transfer by Old Natrol to a foreign bank account of Plethico's choosing without challenge or objection from his subordinates.

41.     New Natrol has discovered through its investigation that the Fabtech Contract did not in fact originate with FTIL, but instead with Plethico itself.

42.     FTIL has confirmed to New Natrol that it had no knowledge of or involvement in the formation of the contract, and has never authorized Plethico or any of its subsidiaries or agents to represent FTIL or act on its behalf.

43.     Recent forensic examination associated with the earliest digital version of the contract located in Old Natrol's files has revealed metadata (*i.e.*, information embedded in a file about the file's characteristics) indicating a creation date of February 28, 2013 (*i.e.*, just days before the Cerberus Financing) and an "Authors" field containing the name "Poonam Sanghavi," a *Plethico* employee who, upon information and belief, was C. Patel's secretary at Plethico. This metadata indicates that Plethico had a direct hand in the drafting of the Fabtech Contract.

44.     Although the construction project contemplated by the Fabtech Contract was the largest, most expensive capital expenditure in Old Natrol's history, C. Patel provided little explanation for how FTIL was selected among other potential contractor options—

10

indeed, Old Natrol's management and other employees had never heard of FTIL, and the contract itself was presented to them only shortly before they were told it would be executed and the $25 million transferred overseas.

45.    No FTIL representatives were included in emails between Dhikle and C. Patel regarding the Fabtech Contract's execution (or emails regarding the Fabtech Contract).

46.    The Fabtech Contract listed Old Natrol's counterparty as "Fabtech Technologies International Limited" on letterhead showing a "branch office" address of "6 Temasek Bouleverd [sic] #24-01 Suntec Tower, 4038986 Singapore."

47.    In reality, this address did not relate to the real FTIL, which has confirmed that it does not have, and has never had, any offices or facilities in Singapore.

48.    Because the Fabtech Contract was primarily for construction work, Plethico—posing as FTIL, Old Natrol's purported counterparty—made false statements about FTIL's capacity as a contractor in order to legitimize the appearance of the contract. Plethico's fraudulently represented in the contract that FTIL was legally empowered to provide the contracted-for services, which would necessarily include having the requisite California contracting licenses.  Paragraph 7.14 of the Fabtech Contract states that:

> FTIL [Fabtech] hereby represents and warrants to [Old] Natrol that it is legally empowered to provide all of the Services required by this Contract in the states in which the Project is and will be located and the states in which all Services will be performed.  At all times during the term of this Contract, FTIL shall, at its sole cost and expense, keep in full force and effect all professional and business permits, licenses and approvals affecting FTIL's ability to perform the Services and otherwise necessary and appropriate to enable FTIL to perform this Contract, including, without limitation, all professional licenses and qualifications of any individual employees of FTIL providing services under this Contract or any other Contract Documents. . . . FTIL has made these representations and warranties to [Old] Natrol knowing that [Old] Natrol is relying to a material extent on said representations and warranties in entering into this Contract.

49.    Despite the fact that FTIL was purportedly contracting to build a manufacturing facility at Old Natrol's facility in Chatsworth, California, despite having

made explicit in the Fabtech Contract that "[i]t is the intention of the parties hereto that FTIL shall act as a general contractor in connection with FTIL's performance of the Constructions Services hereunder," and despite the representations and warranties in the Fabtech Contract that it was legally empowered to do so, the real FTIL was not a licensed as a contractor within the State of California or otherwise registered with the California Secretary of State or California's Contractors State License Board.

50.     The terms of payment under the Fabtech Contract also enabled the Plethico Defendants' fraud.  Although the contract failed to set any specific parameters for the scope of work to be performed by FTIL or timeframes for staged completion, it required Old Natrol to make an _immediate_ $25 million lump sum payment—the contract's total value—to an overseas bank account, account number XXXX5555, held at a Singapore branch of a U.K.-based private banking and wealth management firm called Coutts & Co. Ltd. ("Coutts"), discussed further below.

51.     FTIL has confirmed that it has never maintained a bank account at Coutts, including this account referenced in the contract.

52.     The requirement of a lump sum prepayment of the entire $25 million contract amount, despite the fact that the construction was supposed to take place in phases over many months, enabled the Plethico Defendants to take control over the entire $25 million immediately.

53.     Old Natrol's then-General Manager, Richard Hiraga ("Hiraga") signed an early version of the Fabtech Contract.

54.     A few days later, however, on March 5, 2013, the very day the Cerberus Financing was completed, Dhikle sent an email from his Plethico account, transmitted through Plethico's servers in India, to C. Patel, attaching a revised version of the contract. Because, upon information and belief, C. Patel was in the United States, this email message was transmitted over international wires in interstate commerce.

12

55.     That the Fabtech Contract actually originated with Plethico and was not authorized by any representatives of FTIL was not disclosed anywhere in the contract itself or in any email communications from Dhikle or C. Patel.

56.     After a further email exchange between C. Patel and Dhikle, on March 6, 2013, Dhikle sent an email from his Plethico account, transmitted through Plethico's servers in India, to C. Patel, attaching a copy of the Fabtech Contract purportedly signed by a representative of FTIL.  Because, upon information belief, C. Patel or other recipients were in the United States, this email message was transmitted over international wires in interstate commerce.

57.     The handwritten countersignature by the purported representative of FTIL on this Fabtech Contract is not accompanied by any printed text identifying his/her name, and the person is referenced only as "EXECUTIVE DIRECTOR."

58.     The real FTIL has stated that this signature is a forgery of the signature of A.A. Usmani, FTIL's Executive Director.

59.     That same day, March 6, 2013, C. Patel forwarded the Fabtech Contract by email to his subordinates at Old Natrol, including Hiraga, Jenia Khudagulyan ("Khudagulyan") (Old Natrol's COO), and Thomas Spaeth (Old Natrol's then-CFO), and instructed them to finalize and execute it.

60.     Per C. Patel's instructions, on March 6, 2013, Old Natrol employees executed a wire transfer of $25 million in company funds to the purported bank account of FTIL (*i.e.*, account number XXXX5555 at Coutts in Singapore), as identified in the Fabtech Contract supplied by Dhikle and C. Patel.

61.     FTIL, however, did not circulate the bank account number to be used for the Fabtech Contract and $25 million wire transfer.  Email evidence demonstrates that *Plethico* was the party that identified the bank account number.

62.     On March 7, 2013, the day after the $25 million wire transfer, a Plethico employee named Prasad Joshi—not anyone from FTIL—sent an email to C. Patel at

C. Patel's personal email account, alerting him that, according to Coutts, the funds had been wired to the wrong account number. Joshi requested that C. Patel cause the sending bank to resubmit a corrected account number of XXXX9596.

63.     Joshi's email to C. Patel included no FTIL representatives, made no reference to any FTIL personnel, and contained no explanation of why Plethico had access to confidential, legally-protected information regarding bank accounts purportedly maintained by FTIL at Coutts.[1]  In addition, Joshi did not explain why Plethico—not FTIL—was conveying this information to C. Patel.  FTIL has confirmed that it does not own this account (or any other account at Coutts) and did not receive the $25 million wire transfer.

64.     On March 7, 2013, shortly after receiving Joshi's email, C. Patel emailed Khudagulyan and simply directed her to "Pls do this tday" (*i.e.*, correct the account number).  C. Patel subsequently signed an amended version of the Fabtech Contract, purportedly executed on March 6, 2013, which included the corrected account number.

65.     The use of Coutts to receive the $25 million wire transfer was no accident. Plethico and/or its affiliates and agents have banked at Coutts.  On information and belief, account numbers XXXX5555 and/or XXXX9596 were used by Plethico, its affiliates, and its agents to commit this fraud.

66.     On its website, Coutts describes itself as providing "private banking" expertise and experience "managing wealth."  Coutts appears to have no locations in the United States and instead has locations in, among other places, Switzerland, Hong Kong, Singapore, the U.K. (various locations), the Channel Islands, the Isle of Man, Monaco, and Dubai.

---

[1]  Singapore has strict bank secrecy laws governing the disclosure of customer account information by banks, like Coutts, that operate with branches in Singapore.

67.     Plethico has used Coutts for certain accounts belonging to its two intermediate shell holding companies, Defendants PGH and PUSH, since at least 2011.

68.     Defendant PGH has maintained a business account at Coutts.

69.     In August and November 2011, Ramesh Jethva ("Jethva"), who, upon information and belief, was a Plethico employee, exchanged emails with Allied Corporate Services ("Allied"), which, according to its website, provides outside accounting and financial statement preparation services.  Jethva requested that Allied prepare financial statements pertaining to Plethico's wholly-owned subsidiary holding company, Defendant PGH.  During this exchange, Allied requested that Jethva provide bank statements regarding at least one account held by Defendant PGH at Coutts.

70.     Defendant PUSH has also maintained a business account at Coutts.

71.     In March 2011, Plethico employee Sushil Wadekar emailed a draft of PUSH's annual report, which listed PUSH's two main business bank accounts at "BNP" (presumably, BNP Paribas) and "RBS Coutts."  In addition, in March 2011, upon information and belief, Plethico caused Old Natrol to wire $3.4 million to an account held by Defendant PUSH at Coutts.

72.     Upon information and belief, Plethico and its affiliates and agents, including but not limited to Defendants PGH and PUSH, assumed control of the $25 million transferred pursuant to the Fabtech Contract to Coutts at the accounts numbered XXXX5555 and/or XXXX9596.

**Plethico's Efforts to Conceal the Fraud from Old Natrol and its Lender**

73.     Following the execution of the fraudulent Fabtech Contract and the immediate diversion of the $25 million in borrowed funds in March 2013, Plethico was aware that Old Natrol's lender, Cerberus, would scrutinize the terms of such a large cash outflow so soon after Old Natrol's receipt of the funds.

15

74.     To conceal its fraud and make Old Natrol and Cerberus believe that "Fabtech" would perform under the contract, Plethico undertook an elaborate scheme to "paper" over the false contracting relationship between Old Natrol and the fictitious "Fabtech."  These efforts took place during a period of time in which Cerberus was requesting information to substantiate the legitimacy of the Fabtech Contract.

75.     For example, on March 12, 2013, C. Patel sent an email from his Plethico account, transmitted through Plethico's servers in India, to Khudagulyan in the United States, attaching (1) a purported "plant layout from fabtech" and (2) a March 8, 2013 letter on Fabtech letterhead titled "Preliminary Plant Layout Option for New Natrol Facility." Like the signature of the Fabtech Contract itself, the letter's signature was not legible, and no employee name was printed under the signature, which instead referenced only the title "Project Manager, Fabtech International Technologies Limited."

76.     Similarly, on April 2, 2013, Dhikle executed on behalf of Plethico a Second Lease Amendment with Old Natrol's landlord, consenting to the lease as guarantor for Old Natrol.  This amendment reflected the expansion of Old Natrol's existing facility space to accommodate the anticipated construction contemplated by the Fabtech Contract.

77.     Furthermore, Plethico—but never any FTIL representatives—provided information in response to written inquiries by Cerberus into the Fabtech Contract.

78.     On April 26, 2013, Cerberus representatives emailed Khudagulyan about "a number of items we have multiple questions on" regarding the Fabtech Contract, including questions about the timeline of the planned construction, costs incurred by Fabtech to date, and Fabtech's financial viability.

79.     On April 30, 2013, Khudagulyan forwarded Cerberus's inquiry to C. Patel— who had both furnished and executed the Fabtech Contract—asking for his "help" regarding Cerberus's questions.

80.     That same day, April 30, 2013, C. Patel sent an email from his Plethico account, transmitted through Plethico's servers in India, to Mahesh Munot ("Munot") of

16

Plethico, as well as to Khudagulyan in the United States, instructing Munot to "give suitable answers to Jenia [Khudagulyan]." No FTIL employees were copied on this email to Munot.

81.    Several days later, on May 4, 2013, Munot sent an email to Khudagulyan in the United States, copying C. Patel (at his Plethico account and therefore transmitted to or through Plethico's servers in India), with preliminary information and charts regarding the timeline for the proposed design and construction project. Again, no FTIL personnel were copied on this email.

82.    As before, Plethico took these steps to create a false appearance of legitimacy to the fraudulent contract.

83.    Following Old Natrol's failure to file the first required financial compliance certification under the Cerberus Financing agreement, Cerberus required Old Natrol to begin paying default interest on the loan at a rate of 12.75%.

84.    Based on this and other claimed technical breaches of the Cerberus Financing agreement, coupled with its inability to get satisfactory answers regarding the Fabtech Contract, Cerberus declared a default in September 2013 and froze Old Natrol's main operating account.

85.    In late 2013, as Cerberus's inquiries into the Fabtech Contract intensified, Plethico involved an unwitting FTIL (the real entity) in its brazen charade to further conceal its fraudulent diversion of $25 million in borrowed funds.

86.    According to information recently provided by FTIL, in November 2013— more than eight months *after* the execution of the Fabtech Contract but during a time period in which Cerberus was making repeated inquiries about the contract—S. Patel (Plethico's Managing Director) approached the real FTIL to engage the firm to create conceptual design drawings for the anticipated Old Natrol construction project for a set fee of $35,000 (USD).

17

87.     S. Patel told FTIL that it would likely be awarded the eventual contract, but did *not* make FTIL aware that there already was a fraudulent contract executed by Plethico in its name—the Fabtech Contract.

88.     In reality, S. Patel's request was a further fraud designed to create the appearance of a legitimate contract and business relationship with FTIL.

89.     Shortly thereafter, on December 4, 2013, in response to requests from Cerberus for an in-person meeting with Fabtech to discuss the Fabtech Contract, S. Patel invited FTIL to attend a meeting the next day to discuss the timeline and budget for the conceptual designs with representatives of PricewaterhouseCoopers ("PwC"), who were working on behalf of Cerberus.

90.     At the December 5 meeting, S. Patel failed to appear, and PwC showed FTIL representatives the Fabtech Contract containing the forged signature of A.A. Usmani, FTIL's Executive Director.  Shocked and surprised to learn of the bogus Fabtech Contract, and unable to answer PwC's questions regarding it, FTIL's representatives asked for a further meeting at which S. Patel would need to be present.

91.     S. Patel avoided repeated requests for a subsequent meeting, and FTIL's own attempts to obtain an explanation from S. Patel and Plethico failed.

92.     On December 19, 2014, FTIL's lawyers in India sent a letter to Plethico, S. Patel, C. Patel, and other Plethico officers and directors, threatening legal action for Plethico's use of FTIL's name in the course of this fraud.  In the letter, FTIL denied any involvement in the fraudulent Fabtech Contract and Plethico's various machinations to conceal its fraud.

93.     Although FTIL sent this letter during the pendency of the bankruptcy case before this Court, Plethico and its representatives on the Old Natrol Board never brought this letter to the attention of Old Natrol or this Court.

94.     After the December 5, 2013 meeting, Plethico continued to resist PwC's efforts to gain information regarding the Fabtech Contract.

18

95.     In response to PwC's attempts to issue requests for additional information and a further meeting regarding the Fabtech Contract, on December 30, 2013, S. Patel instructed C. Patel to resist Cerberus's further efforts to get information on Fabtech, stating:

> We have received the attached email form [sic] PWC addressing to Mr. Khan from Fabtech asking certain questions with respect to the ongoing project.  As per our last discussion Cerebus [sic] has given a loan to Natrol and Natrol has given complete details of the project to Cerebus [sic] and such question to our Vendor would be undesirable and would create irritation among our relationship.

> Please take it up with Cerebus [sic] if deemed fit and **revert immediately**.

**Plethico Further Conceals Its Fraud During Old Natrol's Bankruptcy Proceedings**

96.     The Fabtech Contract poisoned Old Natrol's relationship with Cerberus, and Cerberus eventually sent a termination notice on June 6, 2014, pursuant to which Cerberus accelerated the Cerberus Financing.  A few days later, on June 11, 2014, Old Natrol filed petitions for relief under Chapter 11 before this Court.

97.     Following the petition date, the Plethico Defendants' fraud scheme only increased in brazenness.

98.     During the pendency of the bankruptcy case, under pressure from Cerberus, Old Natrol consented to the appointment of a Chief Restructuring Officer, Stephen Milner ("Milner") of the accounting firm, Squar Milner.  Old Natrol also agreed to deadlines for either the sale of substantially all of its assets or a refinancing and payoff of the Cerberus loan.

99.     Milner and other representatives of Squar Milner immediately sought job cost information from Old Natrol for the construction work supposedly procured in exchange for the $25 million Fabtech Contract.

100.     Dhikle, who served a dual role as Plethico's General Counsel and a member of Old Natrol's board of directors as Plethico's agent and representative, served as point person for Squar Milner's inquiries.

19

101.     Faced with inquiries that threatened to reveal the Fabtech Contract as a sham, Plethico's first response was to attempt to suppress them entirely.  Almost immediately after Squar Milner began requesting information regarding the Fabtech Contract, Plethico pushed back and attempted to frustrate any contact with Fabtech representatives.

102.     For example, On June 28, 2014, despite Dhikle's clear involvement in the Fabtech scheme—having furnished the Fabtech Contract to C. Patel, obtained the version of the contract purportedly executed by FTIL, signed Old Natrol's Lease Amendment to expand space for the presumed construction, and overseen Old Natrol as one of its directors when the company purportedly undertook its largest capital expenditure ever—Dhikle sent an email to Milner and others claiming that he (Dhikle) had "limited info on Fabtech . . . as I don't know anything about [the] project."

103.     In addition, despite the fact that Squar Milner had only recently been retained and begun researching the Fabtech Contract, on July 1, 2014, Dhikle sent an email to Milner and others attempting to squelch any investigation, stating:

> Fabtech has provided all the details and we cannot bother Fabtech again and again.  They are fed up with us with all the issues surrounding them and Natrol.  They have clearly intimated [to] us that if any future botheration to them on [the] project they are going to take it very serious who are involved with this.  Our relations with them are getting spoiled for no reason.  Fabtech is not going to disclose any cost incurred by them on turn key project which has been told to [Old Natrol's then-bankruptcy counsel] just [a] couple of days back on con call.  Its there [sic] personal matter.

104.     Dhikle sent the above June 28 and July 1, 2014 email messages from his Plethico account, transmitted through Plethico's servers in India to Milner and other recipients in the United States.

105.     Meanwhile, Plethico caused Old Natrol to misrepresent the Fabtech Contract in the Debtors' Schedules in the bankruptcy proceedings, listing in Schedule B to Old Natrol's Schedules of Assets and Liabilities among "Prepaid Expenses" a "Prepayment

for New Warehouse Project" in the amount of $25,000,000.00 with vendor "Fabtech International Limited/Coutts & Co."  (Bk. D.I. 350.)

106.     Based on Plethico's misrepresentations, Squar Milner drafted a memorandum in September 2014 opining that the "Fabtech project will provide substantial benefits to Natrol."

107.     Squar Milner's memorandum, along with the Fabtech Contract and various drawings purportedly related to the Fabtech Contract, were posted on a data site for potential buyers of Old Natrol's assets.

108.     Plethico knew that these false and misleading documents were being displayed on the data site for potential buyers to review and rely upon through Dhikle, its installed agent and representative on Old Natrol's board.

**Plethico Impersonates FTIL Representatives to Perpetuate the Fraud During Old Natrol's Bankruptcy Case**

109.     After Plethico's initial efforts to cut off inquiry and quell suspicions failed, its fraud scheme and pattern of concealment and deception only intensified.  Upon information and belief, Plethico personnel began impersonating representatives of FTIL in email correspondence to, and during conference calls with, Squar Milner and Old Natrol, as well as Old Natrol's auditors, in order to lull them into the false belief that all was proceeding normally on the Fabtech Contract.  These email and telephone communications were transmitted over interstate and international wires between participants in India and California, and elsewhere in the United States.

110.     Specifically, the evidence indicates that Plethico personnel in India created fictitious identities and yahoo.com email accounts for FTIL purporting to originate from various departments of FTIL—specifically, the email accounts fabtechprojects@yahoo.com and fabtechfinance@yahoo.com (collectively, the "Fabtech Yahoo accounts").

21

111.    However, the Fabtech Yahoo accounts did not originate from, and had no connection to, legitimate email accounts associated with FTIL (whose real domain name is "fabtecheng.com," meaning that FTIL email addresses end in "@fabtecheng.com").

112.    Over the course of several months, from approximately July to October 2014, Plethico personnel, using these fictitious identities and Fabtech Yahoo accounts, pretended to be representatives of FTIL in email correspondence and even, upon information and belief, telephone discussions, in interstate and foreign commerce, with Squar Milner and Old Natrol.

113.    Moreover, Plethico personnel created fake FTIL documents and transmitted them via email over interstate and international wires to perpetuate the fraud that there was a real counterparty to the Fabtech Contract.

114.    For example, on July 21, 2014, an individual identifying himself as "Sanjay Sethi, Project Manager" of "Fabtech" in Mumbai, using the fabtechprojects@yahoo.com account, sent a project schedule to Dhikle, who in turn purported to instruct "Sanjay Sethi" to forward it to Old Natrol's management.

115.    On July 23, 2014, "Sanjay Sethi," using the fabtechprojects@yahoo.com account, represented by email to four members of Old Natrol management that he was the point person concerning the Fabtech Contract, stating:

> Dear All:
>
> As instructed by Dev [Dhikle], please find attached herewith the latest project status report of Natrol – California project.  I will be your point of communication for any future query and my contact details are mentioned in the signature below.

116.    In reality, forensic analysis of the email header data associated with this July 23, 2014 message—specifically, the originating IP address[2] for the message—shows that

---

[2]    An IP address is a numerical label that is assigned to and uniquely identifies a device connected to the Internet or participating in another network that uses the Internet Protocol for communication.

the "Sanjay Sethi" email was sent from IP address 182.72.43.50 (the ".50 IP address").

However, the .50 IP address is a static IP address associated with Plethico in India, as

evidenced by numerous email messages sent throughout 2013 and 2014 by more than a

dozen Plethico officers and employees (including C. Patel, S. Patel, Dhikle, and Joshi) that

originated from that *same* static .50 IP address.  Moreover, this message was transmitted

over international wires from India to recipients in the United States.

117.    Indeed, many of the messages sent from fabtechprojects@yahoo.com also

contain hidden HTML (hypertext markup language) code referencing login credentials for

ruchirparikh@plethico.com, a *Plethico* email address pertaining to another *Plethico*

employee, Ruchir Parikh.  In addition, forensic analysis of the attachment to the July 23,

2014 email from "Sanjay Sethi," a file entitled "Project Status Report.pdf" and purporting

to be an update prepared by FTIL about the status of the construction project, reveals

metadata containing an "Author" field with the name "Ruchir."

118.    Upon information and belief, the fabtechprojects@yahoo.com account was

created and used by Plethico to maintain the ruse and fiction that there was an actual, valid

contract with FTIL as a counterparty and to cover up the scheme to abscond with $25

million of Old Natrol funds.

119.    Not satisfied with the quality of responses from "Sanjay Sethi" regarding the

status of the Fabtech Contract, Squar Milner continued to press for additional details in

August 2014, during the pendency of the bankruptcy proceedings.  In response to demands

from Old Natrol's auditors, BDO USA LLP ("BDO"), Milner emailed "Sanjay Sethi" on

August 7, 2014, asking to be put in contact with Fabtech's most knowledgeable

representative regarding the financial aspects of the Fabtech Contract.

120.    On August 11, 2014, "Sanjay Sethi," using the fake

fabtechprojects@yahoo.com account, emailed Milner and others in the United States,

proffering yet another individual as a Fabtech representative, "Ramesh Jethva," described

as a "Senior Manager" in Fabtech's "International Finance Team."

23

121.    Upon information and belief, Jethva was a Plethico employee, based on evidence of the existence and use of a Plethico email account rameshjethva@plethico.com. (*See also* above in Paragraph 42 describing Jethva's role in communicating with Allied regarding Defendant PGH's financial statements.)

122.    This August 11, 2014 message from "Sethi" originated from the .50 IP address associated with Plethico in India and was transmitted over international wires in interstate commerce to recipients in the United States.

123.    In that same August 11, 2014 message, "Sethi" also forwarded documents purporting to evidence a shipment of equipment to be used by Fabtech in the construction of the contracted-for manufacturing facility at Old Natrol, including a bill of lading, invoice, and packing lists.

124.    "Sethi" claimed that Fabtech had only completed its preliminary engineering phase. He also warned against sharing information about the project, stating: "We are marking [sic] this communication to concern Plethico and Natrol management as we are sharing internal details of Turnkey Projects. Would further request not to share the details without further approval of Natrol or Fabtech." Further concealing the deception, "Sethi" stated in his email that "[w]e would again reassure you that Fabtech is totally committed towards the Natrol contract and its contractual obligation."

125.    This and other fraudulent correspondence from the Fabtech Yahoo accounts evidence Plethico's continuing efforts to keep Old Natrol and its representatives in the dark and to discourage further inquiries that might reveal the fraud.

126.    Plethico's deception also included false information provided to BDO during the pendency of the bankruptcy proceedings.

127.    BDO was charged with preparing an audit that would be relied upon by potential buyers of the Old Natrol assets—a fact well known to Dhikle and Plethico. On September 1, 2014, BDO requested that "Sanjay Sethi" confirm that the Fabtech Contract

24

signed by C. Patel was in fact a legitimate contract in force with Old Natrol, and that there were no other "side agreements" that could affect the contract.

128.    On September 2, 2014, "Sanjay Sethi," using the fake fabtechprojects@yahoo.com account, confirmed in writing to BDO that the Fabtech Contract was still in force and there were no side agreements. This message originated from the .50 IP address associated with Plethico in India and was transmitted over international wires in interstate commerce to a BDO representative in the United States.

129.    Dhikle similarly made additional statements designed to conceal Plethico's involvement and perpetuate the fraud that "Fabtech" was legitimately involved in the contract.

130.    On September 1, 2014, Milner expressed frustration to Dhikle regarding the difficulty in getting answers from Fabtech, especially for BDO, and the number of times "Fabtech's" purported representatives missed scheduled phone calls to provide such information.

131.    That same day, September 1, 2014, Dhikle sent a reply from his Plethico account, stating:

> Let me know when to schedule the call I will ask fabtech to be there. I understand your concern and that's my concern too. *Had it been plethico I would have arranged everything but it's a different company on whom we don't have control* and on festive season we cannot force them to attend the call. However, I have requested them to close it in one go. No more further calls.

(Emphasis added.) Upon information and belief, this email was transmitted through Plethico's servers in India and over international wires in interstate commerce to Milner and other recipients in the United States.

132.    Dhikle's distinction in the above email between Plethico and "Fabtech," and his disclaimer of any ability to control "Fabtech" personnel, flies in the face of his and Plethico's involvement in the formation and execution of the contract—including their knowledge that FTIL had not authorized the contract or received the $25 million payment,

25

C. Patel's direction to wire Old Natrol's funds to an account at Plethico's overseas bank, and Plethico's use of its own corporate employees in India to impersonate FTIL representatives with false names and bogus email accounts purportedly associated with FTIL.

**Plethico Arranges a Token Shipment of Equipment During the Bankruptcy Sale Process to Further Conceal the Fraud**

133.   In response to increasingly persistent demands for information to confirm the legitimacy of the Fabtech Contract during the auction process relating to old Natrol's bankruptcy, Plethico, through the fictitious "Sanjay Sethi" and using the fraudulent Fabtech Yahoo accounts, arranged for a token shipment of equipment to be delivered to Old Natrol to make it appear that some performance on the Fabtech Contract was occurring and that more performance would be forthcoming.

134.   On August 11, 2014, "Sanjay Sethi" sent an email from fabtechprojects@yahoo.com to Old Natrol and Squar Milner, attaching, amongst other documents, a bill of lading, invoice, and packing lists relating to a shipment of equipment being sent via ocean transport from Gansons Limited ("Gansons") in India to Old Natrol in California.  This email message originated from the .50 IP address associated with Plethico in India and was transmitted over international wires to recipients in the United States.

135.   Gansons is a legitimate company in India that, according to its website, manufactures and distributes a wide range of processing equipment, including for the pharmaceutical industry.

136.   The purported invoice attached to "Sethi's" email claims a total invoice amount of $3,237,300.

137.   On August 21, 2014, "Sanjay Sethi" sent an email from fabtechprojects@yahoo.com to Old Natrol and Squar Milner informing them that the shipment was on its way to Los Angeles, California.  This email message originated from

the .50 IP address associated with Plethico in India and was transmitted over international wires to recipients in the United States.

138.    After the shipment arrived at the port in Los Angeles, on September 25, 2014, "Sanjay Sethi" sent an email from fabtechprojects@yahoo.com to Old Natrol and Squar Milner, stating that "Once the shipment is cleared & delivered, our Team of Engineers from Manufacturer will be reaching for installation of equipments [sic]."  This email message originated from the .50 IP address associated with Plethico in India and was transmitted over international wires to recipients in the United States.

139.    After a series of delays, the shipment finally cleared U.S. Customs, and, on October 28, 2014, Old Natrol sent an email to "Sanjay Sethi" at fabtechprojects@yahoo.com requesting that Fabtech send its representatives to accept and assemble the equipment.

140.    On October 30, "Sanjay Sethi" responded by sending Old Natrol a Delivery Agreement signed by "Sethi" purportedly on behalf of FTIL and bearing a stamp purporting to be FTIL's corporate seal.

141.    Under the purported Delivery Agreement, "Sethi" agreed that "Fabtech" had requested that Old Natrol accept delivery of the equipment at its facility in Chatsworth, California, and that Old Natrol would accept and hold the equipment only to make it available to "Fabtech," supposedly so that it could complete performance of all of its obligations under the Fabtech Contract.

142.    The Delivery Agreement provided that "Fabtech" remained fully obligated to perform under the Fabtech Contract.

143.    The equipment was delivered to Old Natrol in November 2014.

144.    To date, however, no representative of "Fabtech" has ever shown up to install the equipment.  The equipment remains in its shipping containers at New Natrol's facilities.

27

145.     Through its recent investigation, New Natrol has discovered that Plethico—not FTIL—procured and paid for the equipment sent by Gansons to Old Natrol.

146.     FTIL has confirmed that it did not ship, cause to be shipped, or authorize the shipment of any equipment, goods, or other materials to Old Natrol.

147.     FTIL has further confirmed that it had no knowledge of or involvement in the negotiation, formation, or execution of the Delivery Agreement, and did not authorize anyone to execute the Delivery Agreement on its behalf.

148.     Furthermore, Gansons has confirmed that the equipment order was actually negotiated and arranged by S. Patel, C. Patel, and another Plethico employee named Mahesh.

149.     Documents provided by Gansons show that a Plethico employee named Manesh Dixit submitted the purchase order in July 2013 and C. Patel was copied on internal correspondence with Dixit and another Plethico employee regarding the order.

150.     The documents also show that the order, with a total value of only approximately $625,000 (rather than the $3,237,300 represented by "Sethi's" earlier fraudulent communication), was paid for in tranches, with one payment originating from a Dubai company called "Komedge International FZE," a subsidiary used by Plethico to process international payments on behalf of a Plethico subsidiary (Natrol Global) that has handled international remittances on behalf of Old Natrol.

**PUSH and PGH Are Mere Alter Egos of Plethico**

151.     At all times relevant to the allegations herein, Dhikle, C. Patel, S. Patel, and others known and unknown with whom they perpetrated this fraud on behalf of Plethico, were acting as agents of Plethico (and its alter egos PGH, and PUSH) and were not acting within the course or scope of any employment or agency on behalf of Old Natrol in undertaking and perpetrating the fraud and misconduct alleged herein.  They were in fact

acting without any authorization from Old Natrol and adversely to and against the interests of Old Natrol (as well as those of New Natrol).

152.     Dhikle, C. Patel, and S. Patel along with others known and unknown with whom they perpetrated this fraud, did not disclose their adverse interests or the fact that they were acting on behalf of Plethico in committing fraud and wrongdoing against Old Natrol.  Dhikle, C. Patel, S. Patel, and others known and unknown with whom they perpetrated this fraud, colluded against Old Natrol to its detriment, and acted instead on behalf of adverse interests, *i.e.*, the interests of the Plethico Defendants and their principals and affiliates.

153.     The circumstances of this case are such that disregarding the technically separate corporate entities of Plethico, PGH, and PUSH is proper and necessary.

154.     Plethico entirely owns and controls PGH, and the two share a complete unity of interests.

155.     Upon information and belief, PGH has no independent business operations and is simply a shell company through which Plethico conducted Old Natrol's business operations as well as for purposes of corporate taxes and financing.

156.     Upon information and belief, all income derived by PGH has flowed directly to Plethico.

157.     Upon information and belief, PGH has observed no corporate formalities such as holding board meetings or maintaining corporate minutes.

158.     PGH has maintained a bank account at Coutts, the same U.K.-based private banking and wealth management firm that Plethico and PUSH use (and that was used to facilitate the Fabtech Contract fraud).

159.     Upon information and belief, S. Patel is an officer and/or director of PGH.

160.     Upon information and belief, PGH is severely undercapitalized and is currently in liquidation.

29

161.    PGH entirely owns and controls PUSH, and the two also share a complete unity of interests with Plethico.

162.    Upon information and belief, PUSH has no independent business operations and is simply a shell company through which Plethico conducted Old Natrol's business operations as well as for purposes of corporate taxes and financing.

163.    Upon information and belief, all income derived by PUSH flowed directly to Plethico.

164.    Upon information and belief, PUSH has observed no corporate formalities such as holding board meetings or maintaining corporate minutes.

165.    Upon information and belief, PUSH is severely undercapitalized.

166.    PUSH has maintained a bank account at Coutts, the same U.K.-based private banking and wealth management firm that both Plethico and PGH use (and that was used to facilitate the Fabtech Contract fraud).

167.    Upon information and belief, S. Patel is an officer and/or director of PUSH. PUSH's Managing Directors are S. Patel (Plethico's Chairman and Managing Director) and C. Patel (Plethico's CEO and also a Plethico Director).

168.    Observance of the fiction of a separate existence between PGH, PUSH, and Plethico would sanction a fraud and promote injustice under the circumstances of this case.

169.    With PGH and PUSH as the direct owners of Old Natrol, PGH and PUSH together were the vehicle through which Plethico installed Dhikle and Patel into control and oversight positions in Old Natrol so they could undertake the fraud in connection with the Fabtech Contract.

170.    Although Plethico has acknowledged that it is the "sole equity holder" of Old Natrol and "stands to receive any funds remaining after unsecured creditors are paid in full," Plethico may attempt to do so through its intermediate alter ego subsidiaries, PGH and PUSH.  Justice should not permit Plethico to insulate those funds merely by funneling

them through intermediate, alter ego subsidiaries such as PGH and PUSH to avoid a judgment for its fraudulent conduct.

*   *   *

171.    More than two years after the execution of the Fabtech Contract and the immediate payment of $25 million to receive a "turnkey" project promising new manufacturing lines, New Natrol, as assignee of the Purchased Assets, has found nothing but evidence of fraud by the Plethico Defendants.  To date, none of the promised manufacturing lines is operational, and the equipment sent to Old Natrol remains unclaimed and uninstalled by anyone associated with "Fabtech."

172.    There is no longer any mystery as to why:  FTIL had no involvement with the execution of Fabtech Contract, and the entire $25 million payment disappeared as part of a boldfaced fraud designed by the Plethico Defendants to enrich themselves at the expense of Old Natrol and New Natrol, and to conceal such fraud from this Court during Old Natrol's bankruptcy proceedings and the auction process.

173.    Through fictitious documents, false identities and impersonations, fraudulent email addresses, interstate and international wire communications, and overseas bank accounts making the trail of funds difficult to trace, the Plethico Defendants—at least to date—have succeeded.

174.    As a result, Old Natrol has been damaged and sustained bankruptcy and loss of $25 million in funds, plus loss of business reputation and other damages.

175.    The Plethico Defendants' fraud and misconduct were carried out with deception and against the interests of Old Natrol and were malicious, fraudulent, and oppressive, justifying an award of punitive damages.  As noted above, New Natrol stands in the shoes of Old Natrol for purposes of pursuing damages and remedies in this case.

176.    The Plethico Defendants continue their fraudulent scheme in the bankruptcy proceeding, effecting a continuing fraud on both New Natrol and this Court.

31

177.    As described, as a direct result of Plethico's diversion of $25 million of Old Natrol's cash to Coutts accounts controlled by Plethico, the Plethico Defendants caused Old Natrol to file these bankruptcy proceedings.

178.    Then, post-petition, the Plethico Defendants concealed their fraud and used the benefits of Section 363 to entice buyers and maximize the sale price for the Old Natrol assets—to the detriment of New Natrol—which will now directly benefit the Plethico Defendants.

179.    Among the assets that New Natrol purchased as part of this sale was the fake Fabtech Contract.

180.    The Plethico Defendants knew about and directed that affirmative misstatements be made about the legitimacy of the Fabtech Contract in connection with the sale of Old Natrol's assets and further fraudulently concealed the true facts about the contract:  that it was a worthless fiction and would never be performed.

181.    The Plethico Defendants are thus trying to twice profit from the same fraud: Having already looted $25 million from Old Natrol through the Fabtech Contract, the Plethico Defendants now stand to benefit again from the sale of the same fictitious contract to New Natrol, the proceeds of which Plethico now intends to receive under Old Natrol's distribution plan.

182.    The residual cash available to distribute in the bankruptcy proceedings on account of equity interest consists mostly of the excess amount New Natrol paid for the Old Natrol assets, which the Plethico Defendants falsely represented included a bona fide pre-paid $25 million contract with FTIL.

183.    The Court should enjoin Plethico from receiving the proceeds of its fraud in the bankruptcy proceedings until the Complaint is adjudicated.

184.    Provisional injunctive remedies are particularly necessary here because New Natrol would be irreparably harmed in their absence.

185.    The distributions to which Plethico may be entitled under the plan of liquidation are the only assets that New Natrol may look to in satisfaction of any judgment entered on its claims, and once the plan distribution is made, New Natrol will be left without a remedy.

186.    Other than their equity interest in Old Natrol, the Plethico Defendants do not have any assets, personnel or operations in the United States, and once any distribution is transferred offshore, it will be beyond the jurisdiction of this Court.

187.    By its own admission in its recent Initial Distribution Motion, Plethico does not even have sufficient assets to pay professionals fees due of $1 million.

188.    Even Old Natrol's assets currently under the Court's protection will not be safe from Plethico's pilfering absent additional provisional injunctive relief.

189.    Plethico has demonstrated a repeated willingness to improperly access and dispose of Old Natrol's funds both pre-petition (as described above) and post-petition.

190.    On March 16, 2015, for example, without any prior notice or disclosure, and without Court approval, Plethico caused Old Natrol to pay "$19 million in estimated taxes on or around March 16, 2014" to unspecified state and federal tax authorities, in disregard of the Debtors' initial plan and disclosure statement's provision for a tax reserve in the amount of $20 million for the payment of income taxes, including any taxes arising from the sale.

191.    The circumstances of this $19 million payment are even more concerning because, although Old Natrol has provided little disclosure and facts are scant, the payment appears to be a *prophylactic* payment on 2014 income tax not yet due, and it may be another ruse by Plethico to seek a later refund directly to its own account.

192.    Unless immediately restrained through a temporary restraining order (pending a hearing on a preliminary injunction) and then a preliminary injunction enjoining Plethico, Old Natrol and all others acting in concert with them or at their direction, including but not limited to any bank or holder of accounts of the Debtors, from

33

transferring any funds to any person or entity, there is a material risk that Plethico will cause Old Natrol to transfer assets to offshore Plethico accounts or other persons leaving New Natrol (and Old Natrol creditors) without a remedy.

193.    For the same reasons, this Court should issue a preliminary injunction enjoining any distribution to any person under a plan of liquidation on account of or for the benefit of any equity interest of Plethico, PGH and PUSH (or any of their assignees) in Old Natrol until the Claims alleged in New Natrol's Complaint can be adjudicated.

194.    The Plethico Defendants cannot claim to be harmed by a provisional injunction preventing them from again absconding with Old Natrol funds to which they are not entitled.

## FIRST CLAIM FOR RELIEF

### Fraudulent Inducement through Intentional Misrepresentation (Fraud in Fact) Against the Plethico Defendants

195.    New Natrol incorporates herein all foregoing paragraphs of this Complaint.

196.    Plethico, by and through its employees and agents, made multiple material misrepresentations of affirmative fact to Old Natrol regarding the Fabtech Contract, FTIL, "Fabtech's" existence, and "Fabtech's" ability and willingness to perform on the Fabtech Contract.  The purpose of Plethico's fraud was to deprive Old Natrol (and New Natrol) of $25 million in funds.

197.    Specifically, Plethico made the following intentional misrepresentations, among others, to Old Natrol:

a.    The misrepresentation that FTIL was a true counterparty to the contract.

b.    The misrepresentation that FTIL would perform under the contract.

c.    The misrepresentation that A.A. Usmani, FTIL's Executive Director, executed the Fabtech Contract on FTIL's behalf.

34

d.   The misrepresentation in Paragraph 7.14 of the Fabtech Contract that the contract "is binding and enforceable against FTIL in accordance with its terms, and that no other signature of any party is necessary to make this Contract binding on and enforceable against FTIL."

e.   The misrepresentation that FTIL maintained bank accounts at Coutts, including account numbers XXXX5555 and XXXX9596.

f.   The misrepresentation in the preamble of the Fabtech Contract that the "Fabtech Technologies International Limited" with whom Old Natrol was contracting was "registered under the laws of Singapore."

g.   The misrepresentation in the Fabtech Contract that FTIL had an office in Singapore, specifically, "6 Temasek Bouleverd [sic] #24-01 Suntec Tower, 4038986 Singapore."

h.   The misrepresentation in Paragraph 4.0 of the Fabtech Contract that FTIL "is skilled in the professional callings necessary to perform the Services" for which Old Natrol was contracting.

i.   The misrepresentation in Paragraph 4.0 of the Fabtech Contract that "FTIL shall perform the Services under this Contract in accordance with the professional standard and quality which prevails among reputable, well-qualified, nationally recognized, licensed design/build general contracting, architectural and engineering firms performing services of the nature and in the locations encompassed within this Contract."

j.   The misrepresentation in Paragraph 7.14 of the Fabtech Contract that FTIL "is legally empowered to provide all of the Services required by this Contract in the states in which the Project is and will be located and the states in which all Services will be performed."

k.    The misrepresentation in Paragraph 7.14 of the Fabtech Contract that FTIL "shall, at its sole cost and expense, keep in full force and

effect all professional and business permits, licenses and approvals affecting

FTIL's ability to perform the Services and otherwise necessary and

appropriate to enable FTIL to perform this Contract, including, without

limitation, all professional licenses and qualifications of any individual

employees of FTIL providing services under this Contract or any other

Contract Documents."

198.    At the time Plethico made or caused to be made the above and other

material misrepresentations of affirmative fact, Plethico knew that they were false and

misleading.

199.    At the time Plethico made or caused to be made the above and other

material misrepresentations of fact, Old Natrol was unaware of their falsity and believed

them to be true.

200.    Moreover, Plethico knew and intended that Old Natrol would rely on such

material and false promises and misrepresentations.

201.    Plethico made the above and other material misrepresentations of

affirmative fact maliciously, intentionally, willfully, fraudulently, and for the purpose of

deceiving Old Natrol, by:

a.  Inducing Old Natrol to enter into the Fabtech Contract, despite

Plethico's knowledge that the "Fabtech" counterparty had neither the ability

nor the intention to perform under the contract, and that the real FTIL had

no knowledge of the contract and had not authorized it;

b.  Inducing Old Natrol to wire $25 million to bank accounts

controlled by Plethico under the pretext that the accounts belonged to FTIL,

without receiving the benefits of the promises it believed it was contracting

for in the Fabtech Contract.

36

202.    In reasonable reliance on Plethico's material misrepresentations, Old Natrol was induced to enter into the Fabtech Contract and wire $25 million to bank accounts as directed by Plethico.

203.    The Fabtech Contract made explicit that "[Old] Natrol [wa]s relying to a material extent on said representations and warranties in entering into this Contract."  This express reliance related specifically to such materially false representations and warranties as:

    a.   that the "Fabtech" counterparty was "legally empowered to provide all of the Services required by this Contract in" California (Paragraph 7.14);

    b.   that "Fabtech" would "keep in full force and effect all professional and business permits, licenses and approvals affecting FTIL's ability to perform the Services and otherwise necessary and appropriate to enable FTIL to perform this Contract" (Paragraph 7.14);

    c.   that "this Contract [wa]s binding and enforceable against FTIL in accordance with its terms, and that no other signature of any party [wa]s necessary to make this Contract binding on and enforceable against FTIL" (Paragraph 7.14);

    d.   that FTIL was "skilled in the professional callings necessary to perform the Services and acknowledges that Natrol, not being skilled in such matters, [wa]s relying upon the skill and knowledge of FTIL." (Paragraph 4.0).

204.    As a direct and proximate result of Plethico's material misrepresentations of affirmative fact, Old Natrol suffered millions of dollars in damages, including, but not limited to, the $25 million it wired to bank accounts as directed by Plethico, costs and expenses, and reasonable attorneys' fees, in an amount to be determined at trial.

37

205.    But for Plethico's misrepresentations, Old Natrol would not have entered into the Fabtech Contract or wired $25 million to bank accounts as directed by Plethico.

206.    On account of Plethico's fraudulent inducement, Plaintiff prays that the Court deem the Fabtech Contract null and void and, in equity, Order restitution by Plethico to Plaintiff for all of the monies paid by Old Natrol to the purported FTIL (*i.e.*, Plethico) in an amount to be proved at trial, which includes but is not limited to the $25 million Old Natrol wired to bank accounts as directed by Plethico, and any other damages the Court finds just and proper, as well as attorneys' fees.

207.    PGH and PUSH, together the direct owners of Old Natrol, were the vehicle through which Plethico installed Dhikle and Patel into positions of control in Old Natrol so that Plethico could undertake the fraud in connection with the Fabtech Contract.

208.    Although Plethico has acknowledged that it is the "sole equity holder" of Old Natrol and "stands to receive any funds remaining after unsecured creditors are paid in full," Plethico will do so through its intermediate alter ego subsidiaries, PGH and PUSH.  In the interests of justice, Plethico should not be allowed to insulate itself from damages by funneling any distribution under a plan of liquidation through intermediate, alter ego subsidiaries such as PGH and PUSH.

209.    If and only if the Court does not rescind the Fabtech Contract and restore Old Natrol to its previous condition vis-à-vis the Fabtech Contract, Plaintiff alternatively seeks compensatory and/or other damages, including punitive damages, in addition to and/or in lieu of rescission and restitution.

210.    The Plethico Defendants' fraudulent conduct, including, but not limited to, numerous material misrepresentations of affirmative fact, was malicious, oppressive, and fraudulent, so as to justify an award of punitive damages.  Plaintiff seeks an award of punitive damages.

211.    To ensure that New Natrol has an adequate remedy, and to prevent the
Plethico Defendants from becoming further unjustly enriched by their fraud, New
Natrol seeks temporary and preliminary injunctive relief preventing enjoining Plethico,
Old Natrol and all others acting in concert with them or at their direction, including but
not limited to any bank or holder of accounts of the Debtors, from transferring any
funds to any person or entity, there is a material risk that Plethico will cause Old Natrol
to transfer assets to offshore Plethico accounts or other persons leaving New Natrol
(and Old Natrol creditors) without a remedy.

## SECOND CLAIM FOR RELIEF

**Fraudulent Inducement through Intentional Misrepresentation (Promissory Fraud)
Against the Plethico Defendants**

212.    New Natrol incorporates herein all foregoing paragraphs of this Complaint.

213.    Plethico made multiple material misrepresentations to Old Natrol of an
actionable promissory nature regarding the Fabtech Contract, FTIL, "Fabtech's"
existence, and "Fabtech's" ability and willingness to perform on the Fabtech Contract.

214.    Specifically, Plethico made the following intentional misrepresentations,
among others, to Old Natrol:

a.    Misrepresentations throughout the Fabtech Contract that FTIL
had a then-present intention to perform under the contract, which
performance, under Paragraph 1.1 of the contract, was to include "location
selection, evaluation, design, development, Construction, start-up, testing of
New Natrol Facility, the design, engineering, procurement, assembly,
installation, testing, calibration and validation of manufacturing, Packing,
distribution, Utility generation, Distribution equipment, systems, all
materials, handling equipment systems, including, without limitation,
refrigeration and specialized heating, ventilation and air conditioning
equipment and systems necessary for the operation of the Facility."

b.   The misrepresentation in Paragraph 4.0 of the Fabtech Contract that "FTIL shall perform the Services under this Contract in accordance with the professional standard and quality which prevails among reputable, well-qualified, nationally recognized, licensed design/build general contracting, architectural and engineering firms performing services of the nature and in the locations encompassed within this Contract."

c.   The misrepresentations in Paragraph 7.14 of the Fabtech Contract that FTIL "is legally empowered to provide all of the Services required by this Contract in the states in which the Project is and will be located and the states in which all Services will be performed."

d.   The misrepresentations in Paragraph 7.14 of the Fabtech Contract that FTIL "shall, at its sole cost and expense, keep in full force and effect all professional and business permits, licenses and approvals affecting FTIL's ability to perform the Services and otherwise necessary and appropriate to enable FTIL to perform this Contract, including, without limitation, all professional licenses and qualifications of any individual employees of FTIL providing services under this Contract or any other Contract Documents."

e.   The misrepresentation that the Fabtech Contract had been authorized by FTIL, as per the purported signature of A.A. Usmani, FTIL's Executive Director, and more specifically the language in Paragraph 7.14 that:  "The person executing this Contract on behalf of FTIL represents that this Contract is binding and enforceable against FTIL in accordance with its terms, and that no other signature of any party is necessary to make this Contract binding on and enforceable against FTIL."

215.   In the months after the Fabtech Contract was executed, despite Natrol's wiring $25 million to the bank account specified in the contract, "Fabtech" made no

legitimate efforts to materially perform, even when repeatedly prompted by Old Natrol and its agents.  Instead, Plethico, often while impersonating the bogus "Fabtech" entity, perpetuated a scheme of obfuscation and delay in order to prevent Old Natrol from discovering that it had been defrauded and that it could not expect any performance because the contract was a hoax and performance was never intended by "Fabtech."

216.    At the time Plethico made or caused to be made the above and other material misrepresentations of promissory intent, Plethico knew that they were materially false and misleading.

217.    At the time Plethico made or caused to be made the above and other material misrepresentations of promissory intent, Old Natrol was unaware of their falsity and believed them to be true.

218.    Moreover, Plethico knew and intended that Old Natrol would rely on such material and false promises and misrepresentations.

219.    Plethico made the above and other material misrepresentations of promissory intent maliciously, intentionally, willfully, fraudulently, and for the purpose of deceiving Old Natrol, by:

a.    Inducing Old Natrol to enter into the Fabtech Contract, despite Plethico's knowledge that the "Fabtech" counterparty had neither the ability nor the intention to perform under the contract, and that the real FTIL had no knowledge of the contract and had not authorized it;

b.    Inducing Old Natrol to wire $25 million to bank accounts controlled by Plethico under the pretext that the accounts belonged to FTIL, without receiving the benefits of the promises it believed it was contracting for in the Fabtech Contract.

220.    In reasonable reliance on Plethico's misrepresentations, Old Natrol was induced to enter the Fabtech Contract and wire $25 million to bank accounts as directed by Plethico.

41

221.    The Fabtech Contract made explicit that "[Old] Natrol [wa]s relying to a material extent on said representations and warranties in entering into this Contract." This express reliance related specifically to such materially false representations and warranties as:

       a.  that the "Fabtech" counterparty was "legally empowered to provide all of the Services required by this Contract in" California (Paragraph 7.14);

       b.  that "Fabtech" would "keep in full force and effect all professional and business permits, licenses and approvals affecting FTIL's ability to perform the Services and otherwise necessary and appropriate to enable FTIL to perform this Contract" (Paragraph 7.14);

       c.  that "this Contract [wa]s binding and enforceable against FTIL in accordance with its terms, and that no other signature of any party [wa]s necessary to make this Contract binding on and enforceable against FTIL" (Paragraph 7.14);

       d.  that FTIL was "skilled in the professional callings necessary to perform the Services and acknowledges that Natrol, not being skilled in such matters, [wa]s relying upon the skill and knowledge of FTIL." (Paragraph 4.0).

222.    As a direct and proximate result of Plethico's material misrepresentations of promissory intent, Old Natrol suffered millions of dollars in damages, including, but not limited to, the $25 million it wired to bank accounts as directed by Plethico, costs and expenses, and reasonable attorneys' fees, in an amount to be determined at trial.

223.    But for Plethico's misrepresentations, Old Natrol would not have entered into the Fabtech Contract or wired $25 million to bank accounts as directed by Plethico.

224.    On account of Plethico's fraudulent inducement, Plaintiff prays that the Court deem the Fabtech Contract null and void and, in equity, Order restitution by

42

Plethico to Plaintiff for all of the monies paid by Old Natrol to the purported FTIL (*i.e.*, Plethico) in an amount to be proved at trial, which includes but is not limited to the $25 million Old Natrol wired to bank accounts as directed by Plethico, and any other damages the Court finds just and proper, as well as attorneys' fees.

225. PGH and PUSH, together the direct owners of Old Natrol, were the vehicle through which Plethico installed Dhikle and Patel into positions of control in Old Natrol so that Plethico could undertake the fraud in connection with the Fabtech Contract.

226. Although Plethico has acknowledged that it is the "sole equity holder" of Old Natrol and "stands to receive any funds remaining after unsecured creditors are paid in full," Plethico will do so through its intermediate alter ego subsidiaries, PGH and PUSH. In the interests of justice, Plethico should not be allowed to insulate itself from damages by funneling any distribution under a plan of liquidation through intermediate, alter ego subsidiaries such as PGH and PUSH.

227. If and only if the Court does not rescind the Fabtech Contract and restore Old Natrol to its previous condition vis-à-vis the Fabtech Contract, Plaintiff alternatively seeks compensatory and/or other damages, including punitive damages, in addition to and/or in lieu of rescission and restitution.

228. The Plethico Defendants' fraudulent conduct, including, but not limited to, its numerous material misrepresentations of promissory intent, was malicious, oppressive, and fraudulent, so as to justify an award of punitive damages. Plaintiff seeks an award of punitive damages.

229. To ensure that New Natrol has an adequate remedy, and to prevent the Plethico Defendants from becoming further unjustly enriched by their fraud, New Natrol seeks temporary and preliminary injunctive relief enjoining Plethico, Old Natrol and all others acting in concert with them or at their direction, including but not limited to any bank or holder of accounts of the Debtors, from transferring any funds to any

person or entity, there is a material risk that Plethico will cause Old Natrol to transfer

assets to offshore Plethico accounts or other persons leaving New Natrol (and Old

Natrol creditors) without a remedy.

### THIRD CLAIM FOR RELIEF

**Fraudulent Inducement through Fraudulent Concealment**
**Against the Plethico Defendants**

230.    New Natrol incorporates herein all foregoing paragraphs of this Complaint.

231.    With knowledge and intent to deceive, Plethico also failed to disclose to,

and affirmatively concealed material facts from, Old Natrol regarding the Fabtech

Contract, FTIL, "Fabtech's" existence, and "Fabtech's" ability and willingness to perform

on the Fabtech Contract.  This affirmative concealment of material facts rendered

Plethico's representations regarding the Fabtech Contract as alleged herein materially false

and misleading.

232.    Plethico failed to disclose and, in fact, concealed the following material

facts, among others, which were known to Plethico—but not known or accessible to

Old Natrol, and which Old Natrol had no duty to independently investigate:

> a.   The fact that the purported "Fabtech" counterparty to the
>
> Fabtech Contract was not a real entity but was instead a fiction created by
>
> Plethico to resemble FTIL, without FTIL's authorization or knowledge.
>
> b.   The fact that the purported "Fabtech" counterparty to the
>
> Fabtech Contract was not a real entity and thus had no skills or knowledge
>
> whatsoever in the professional callings necessary to perform under the
>
> Fabtech Contract.
>
> c.   The fact that FTIL had not approved and indeed had no
>
> knowledge of the Fabtech Contract.  FTIL further never authorized Plethico
>
> to act on its behalf, contract in its name, or otherwise use the "Fabtech"
>
> name and logo.  The person purporting to execute the Fabtech Contract on

44

FTIL's behalf was not authorized to act and was not acting on behalf of FTIL.

      d.  The fact that the bank accounts associated with account numbers XXXX5555 and XXXX9596 at Coutts in Singapore, to which Plethico directed Old Natrol to wire $25 million in connection with the Fabtech Contract, were in no way connected to FTIL, but rather were accounts used by Plethico to further its fraud.

      e.  The fact that A.A. Usmani, FTIL's Executive Director, never executed the Fabtech Contract on FTIL's behalf; rather, the signature purporting to be his was a forgery undertaken by or at the behest of Plethico.

      f.  The fact that FTIL had no office at "6 Temasek Bouleverd [sic] #24-01 Suntec Tower, 4038986 Singapore," and indeed has never held any office in Singapore.

233.    Plethico had a duty to disclose these material facts to Old Natrol.

234.    Plethico's omission and concealment of these and other material facts rendered its express representations as alleged herein false and materially misleading.

235.    Moreover, at the time of Plethico's omission and concealment of these and other material facts, Plethico knew the facts were accessible only to it, and that Old Natrol did not know, and could not reasonably discover, these undisclosed facts, and had no duty to independently investigate them.

236.    Old Natrol did not know any of the material facts that Plethico omitted and concealed from its representations.

237.    Plethico intended to deceive Old Natrol by omitting and concealing the undisclosed material facts from its representations.  Plethico knowingly omitted and concealed the material information for the purpose of:

45

a.   Inducing Old Natrol to enter into the Fabtech Contract, despite Plethico's knowledge that the "Fabtech" counterparty had neither the ability nor the intention to perform under the contract, and that the real FTIL had no knowledge of the contract and had not authorized it;

b.   Inducing Old Natrol to wire $25 million to bank accounts controlled by Plethico under the pretext that the accounts belonged to FTIL, without receiving the benefits of the promises for which it believed it was contracting in the Fabtech Contract.

238.   In reasonable reliance on Plethico's fraudulent misrepresentations and omissions, Old Natrol was induced to enter the Fabtech Contract and wire $25 million to bank accounts as directed by Plethico.

239.   The Fabtech Contract made explicit that "[Old] Natrol [wa]s relying to a material extent on said representations and warranties in entering into this Contract." This express reliance related specifically to materially false representations and warranties including, but not limited to, the following:

a.   that the "Fabtech" counterparty was "legally empowered to provide all of the Services required by this Contract in" California (Paragraph 7.14);

b.   that "Fabtech" would "keep in full force and effect all professional and business permits, licenses and approvals affecting FTIL's ability to perform the Services and otherwise necessary and appropriate to enable FTIL to perform this Contract" (Paragraph 7.14);

c.   that "this Contract [wa]s binding and enforceable against FTIL in accordance with its terms, and that no other signature of any party [wa]s necessary to make this Contract binding on and enforceable against FTIL" (Paragraph 7.14);

46

d.   that FTIL was "skilled in the professional callings necessary to

perform the Services and acknowledges that Natrol, not being skilled in

such matters, [wa]s relying upon the skill and knowledge of FTIL."

(Paragraph 4.0).

240.   As a direct and proximate result of Plethico's fraudulent omissions and

concealment of material facts, Old Natrol suffered millions of dollars in damages,

including, but not limited to, the $25 million in funds it wired to bank accounts as directed

by Plethico, costs and expenses, and reasonable attorneys' fees, in an amount to be

determined at trial.

241.   But for Plethico's fraudulent omissions and concealment, Old Natrol would

not have entered into the Fabtech Contract or wired $25 million to bank accounts as

directed by Plethico.

242.   On account of Plethico's fraudulent inducement, Plaintiff prays that the

Court deem the Fabtech Contract null and void and, in equity, Order restitution by

Plethico to Plaintiff for all of the monies paid by Old Natrol to the purported FTIL (*i.e.*,

Plethico) in an amount to be proved at trial, which includes but is not limited to the $25

million Old Natrol wired to bank accounts as directed by Plethico, and any other

damages the Court finds just and proper, as well as attorneys' fees.

243.   PGH and PUSH, together the direct owners of Old Natrol, were the

vehicle through which Plethico installed Dhikle and Patel into positions of control in

Old Natrol so that Plethico could undertake the fraud in connection with the Fabtech

Contract.

244.   Although Plethico has acknowledged that it is the "sole equity holder"

of Old Natrol and "stands to receive any funds remaining after unsecured creditors are

paid in full," Plethico will do so through its intermediate alter ego subsidiaries, PGH

and PUSH.  In the interests of justice, Plethico should not be allowed to insulate itself

from damages by funneling any distribution under a plan of liquidation through intermediate, alter ego subsidiaries such as PGH and PUSH.

245.    If and only if the Court does not rescind the Fabtech Contract and restore Old Natrol to its previous condition vis-à-vis the Fabtech Contract, Plaintiff alternatively seeks compensatory and/or other damages, including punitive damages, in addition to and/or in lieu of rescission and restitution.

246.    The Plethico Defendants' fraudulent conduct, including, but not limited to, numerous fraudulent nondisclosures, was malicious, oppressive, and fraudulent, so as to justify an award of punitive damages.  Plaintiff seeks an award of punitive damages.

247.    To ensure that New Natrol has an adequate remedy, and to prevent the Plethico Defendants from becoming further unjustly enriched by their fraud, New Natrol seeks temporary and preliminary injunctive relief enjoining Plethico, Old Natrol and all others acting in concert with them or at their direction, including but not limited to any bank or holder of accounts of the Debtors, from transferring any funds to any person or entity, there is a material risk that Plethico will cause Old Natrol to transfer assets to offshore Plethico accounts or other persons leaving New Natrol (and Old Natrol creditors) without a remedy.

## FOURTH CLAIM FOR RELIEF

### Reimbursement for Illegal Construction Contract under
### California Business & Professions Code 7031(b)
### Against the Plethico Defendants

248.    New Natrol incorporates herein all foregoing paragraphs of this Complaint.

249.    The services that the purported FTIL contracted to perform as part of the Fabtech Contract were construction services for which, among other things, a contractor's license was required.  Indeed, the Fabtech Contract made explicit in Paragraph 2.4.5 that "[i]t is the intention of the parties hereto that FTIL shall act as a general contractor in connection with FTIL's performance of the Constructions Services hereunder."

48

250.     Further, in Paragraph 7.14, the purported FTIL expressly "represent[ed] and warrant[ed] to Natrol that it is legally empowered to provide all of the Services required by this Contract in the states in which the Project is and will be located and the states in which all Services will be performed."

251.     In that same paragraph, the purported FTIL stated that "[a]t all times during the term of this Contract, FTIL shall, at its sole cost and expense, keep in full force and effect all professional and business permits, licenses and approvals affecting FTIL's ability to perform the Services and otherwise necessary and appropriate to enable FTIL to perform this Contract, including, without limitation, all professional licenses and qualifications of any individual employees of FTIL providing services under this Contract or any other Contract Documents."

252.     In reality, as alleged herein, Plethico was masquerading as FTIL in connection with the Fabtech Contract, and the real FTIL neither authorized nor executed the contract.

253.     Neither Plethico nor the purported FTIL was licensed as a contractor within the state of California or otherwise registered with the California Secretary of State or California's Contractors State License Board at any time relevant to the Fabtech Contract. Thus, neither Plethico nor FTIL was legally empowered to perform the construction services promised in the Fabtech Contract or to accept any payments in connection therewith.  As a result, the Fabtech Contract is illegal and void as a matter of public policy.

254.     PGH and PUSH, together the direct owners of Old Natrol, were the vehicle through which Plethico installed Dhikle and Patel into positions of control in Old Natrol so that Plethico could undertake the fraud in connection with the illegal and void Fabtech Contract.

255.     Although Plethico has acknowledged that it is the "sole equity holder" of Old Natrol and "stands to receive any funds remaining after unsecured creditors are paid in full," Plethico will do so through its intermediate alter ego subsidiaries, PGH

49

and PUSH.  In the interests of justice, Plethico should not be allowed to insulate itself from damages by funneling any distribution under a plan of liquidation through intermediate, alter ego subsidiaries such as PGH and PUSH.

256.    The Plethico Defendants caused Old Natrol to wire $25 million in Old Natrol's funds to the overseas bank account of Plethico's choosing, purportedly in FTIL's name, as specified in Paragraph 5.1.2 of the Fabtech Agreement, and thereby received and gained control of these funds.

257.    Pursuant to California Business & Professions Code 7031(b), the Plethico Defendants are obligated to make full restitution of all monies received as part of the illegal and void Fabtech Contract.

258.    To ensure that New Natrol has an adequate remedy, and to prevent the Plethico Defendants from becoming further unjustly enriched by their fraud, New Natrol seeks temporary and preliminary injunctive relief enjoining Plethico, Old Natrol and all others acting in concert with them or at their direction, including but not limited to any bank or holder of accounts of the Debtors, from transferring any funds to any person or entity, there is a material risk that Plethico will cause Old Natrol to transfer assets to offshore Plethico accounts or other persons leaving New Natrol (and Old Natrol creditors) without a remedy.

## FIFTH CLAIM FOR RELIEF

### Rescission / Restitution
### Against the Plethico Defendants

259.    New Natrol incorporates herein all foregoing paragraphs of this Complaint.

260.    Rescission and full restitution are required as a result of the Plethico Defendants' fraudulent inducement of Old Natrol to enter the Fabtech Agreement.

261.    As a result of Plethico's misrepresentations and omissions to Old Natrol with respect to the material terms of the Fabtech Contract, there was no mutual assent, and therefore no enforceable contract was formed between the parties.  As a result, rescission

and full restitution to Plaintiff, including but not limited to the $25 million Old Natrol paid under the contract, are required.

262.    Moreover, rescission and full restitution to Plaintiff, including but not limited to the $25 million Old Natrol paid under the contract, are also mandated as a matter of law insofar as the purported FTIL was not a licensed contractor and thus, under California Business & Professions Code 7031, the Fabtech Contract, pursuant to which the purported FTIL promised various construction services as "general contractor," is illegal and void.

263.    As between the Plethico Defendants (impersonating FTIL) and Plaintiff, it would be unjust for Plethico to retain the benefit of the Fabtech Contract that it illegally and fraudulently procured and under which it has not materially performed.

264.    The Plethico Defendants have been unjustly enriched as a result of the fraudulent and illegal acts alleged herein.

265.    As part of any ordered rescission and restitution, Plaintiff is prepared to return any and all benefit it received under the Fabtech Contract, including the token shipment of equipment that Plethico arranged to be sent from Gansons to Old Natrol.

266.    PGH and PUSH, together the direct owners of Old Natrol, were the vehicle through which Plethico installed Dhikle and Patel into positions of control in Old Natrol so that Plethico could undertake the fraud in connection with the illegal and void Fabtech Contract.

267.    Although Plethico has acknowledged that it is the "sole equity holder" of Old Natrol and "stands to receive any funds remaining after unsecured creditors are paid in full," Plethico will do so through its intermediate alter ego subsidiaries, PGH and PUSH.  In the interests of justice, Plethico should not be allowed to insulate itself from damages by funneling any distribution under a plan of liquidation through intermediate, alter ego subsidiaries such as PGH and PUSH.

51

268.    Plaintiff prays that the Court deem the Fabtech Contract null and void and that the Court make an equitable Order with respect to restitution by the Plethico Defendants to Plaintiff for all of the moneys paid by Old Natrol to the purported FTIL (*i.e.* Plethico) in an amount to be proved at trial, which includes but is not limited to the $25 million Old Natrol wired to bank accounts as directed by Plethico, and any other damages the Court finds just and proper, as well as attorneys' fees.

269.    If and only if the Court does not rescind the Fabtech Contract and restore Old Natrol to its previous condition vis-à-vis the Fabtech Contract, Plaintiff alternatively seeks compensatory and/or other damages, including punitive damages, in addition to and/or in lieu of rescission and restitution.

270.    To ensure that New Natrol has an adequate remedy, and to prevent the Plethico Defendants from becoming further unjustly enriched by their fraud, New Natrol seeks temporary and preliminary injunctive relief enjoining Plethico, Old Natrol and all others acting in concert with them or at their direction, including but not limited to any bank or holder of accounts of the Debtors, from transferring any funds to any person or entity, there is a material risk that Plethico will cause Old Natrol to transfer assets to offshore Plethico accounts or other persons leaving New Natrol (and Old Natrol creditors) without a remedy.

## SIXTH CLAIM FOR RELIEF

### Fraud and Deceit
### Against the Plethico Defendants

271.    New Natrol incorporates herein all foregoing paragraphs of this Complaint.

272.    Plethico, by and through its employees and agents, made multiple material misrepresentations and fraudulently failed to disclose material information regarding the Fabtech Contract, FTIL, "Fabtech's" existence, and "Fabtech's" ability and willingness to perform on the Fabtech Contract that defrauded New Natrol in connection with its

acquisition (through purchase and assignment by Aurobindo) of Old Natrol's assets, including the Fabtech Contract.

273.    In addition to other the false statements and material nondisclosures identified in this Complaint, Plethico further concealed its fraud with the intent to entice buyers and maximize the sale price of Old Natrol's assets (including the Fabtech Contract), for the purpose of inflating the residual cash available, after the payment of creditor claims, to distribute to the Plethico Defendants through a plan of liquidation on account of the Plethico Defendants' interests in Old Natrol.

274.    In addition to the other false statements and material nondisclosures identified in this Complaint, Plethico made and caused to be made the following intentional and material misrepresentations and omissions, which Plethico knew would be conveyed to potential buyers, with the intention of misleading potential buyers such as New Natrol:

  a.    Dhikle's misrepresentation in a June 28, 2014 email to Milner and others claiming that he (Dhikle) had "limited info on Fabtech . . . as I don't know anything about [the] project." This statement was materially false and misleading when made because Dhikle, as an agent of Plethico, knew that the Fabtech Contract was in fact a fraud and was not an actual contractual obligation with a legitimate counterparty but was instead a vehicle for the fraud committed by Plethico.

  b.    Dhikle's misrepresentations in a July 1, 2014 email to Milner and others that "Fabtech has provided all the details and we cannot bother Fabtech again and again. They are fed up with us with all the issues surrounding them and Natrol. . . . Its there [sic] personal matter." These statements were materially false and misleading when made because Dhikle, as an agent of Plethico, knew that the Fabtech contract was in fact a

fraud and was not an actual contractual obligation with a legitimate counterparty but was instead a vehicle for the fraud committed by Plethico.

c. At the behest of Plethico, the misrepresentations by a Plethico agent in a July 23, 2014 email, using a fictitious "Sanjay Sethi, Project Manager" of "Fabtech" identity and Fabtech Yahoo email account to impersonate FTIL personnel, attaching a false and fictitious "project status report of Natrol – California project." These statements and documents were materially false and misleading when made because the agent of Plethico knew that the Fabtech contract was in fact a fraud and was not an actual contractual obligation with a legitimate counterparty but was instead a vehicle for the fraud committed by Plethico.

d. At the behest of Plethico, the misrepresentation by a Plethico agent in an August 11, 2014 email, using a fictitious "Sanjay Sethi" of "Fabtech" identity and Fabtech Yahoo email account to impersonate FTIL personnel, claiming that Plethico employee Ramesh Jevtha was a "Senior Manager" in FTIL's "International Finance Team." This statement was materially false and misleading when made because the agent of Plethico knew that the Fabtech contract was in fact a fraud and was not an actual contractual obligation with a legitimate counterparty but was instead a vehicle for the fraud committed by Plethico.

e. At the behest of Plethico, the misrepresentations by a Plethico agent in an August 11, 2014 email, using a fictitious "Sanjay Sethi" of "Fabtech" identity and Fabtech Yahoo email account to impersonate FTIL personnel, attaching a falsified bill of lading, invoice, and packing lists purporting to evidence a shipment of equipment to be used by Fabtech in the construction of the contracted-for manufacturing facility at Old Natrol. These statements and documents were materially false and misleading when

54

made because the agent of Plethico knew that the Fabtech contract was in fact a fraud and was not an actual contractual obligation with a legitimate counterparty but was instead a vehicle for the fraud committed by Plethico.

e.  At the behest of Plethico, the misrepresentation by a Plethico agent in an August 11, 2014 email, using a fictitious "Sanjay Sethi" of "Fabtech" identity and Fabtech Yahoo email account to impersonate FTIL personnel, that "[w]e would again reassure you that Fabtech is totally committed towards the Natrol contract and its contractual obligation."  This statement was materially false and misleading when made because the agent of Plethico knew that the Fabtech contract was in fact a fraud and was not an actual contractual obligation with a legitimate counterparty but was instead a vehicle for the fraud committed by Plethico.

f.  At the behest of Plethico, the misrepresentations by a Plethico agent in a September 2, 2014 email to BDO, using a fictitious "Sanjay Sethi" of "Fabtech" identity and Fabtech Yahoo email account to impersonate FTIL personnel, falsely claiming that the Fabtech Contract was still in force and that there were no side agreements in attempt to legitimize the contract.  These statements were materially false and misleading when made because the agent of Plethico knew that the Fabtech contract was in fact a fraud and was not an actual contractual obligation with a legitimate counterparty but was instead a vehicle for the fraud committed by Plethico.

g.  Dhikle's misrepresentations in a September 1, 2014 email to Milner, stating:  "Let me know when to schedule the call I will ask fabtech to be there.  I understand your concern and that's my concern too.  *Had it been plethico I would have arranged everything but it's a different company on whom we don't have control* and on festive season we cannot force them to attend the call.  However, I have requested them to close it in one go.  No

more further calls." These statements were materially false and misleading when made because Dhikle knew that the Fabtech contract was in fact a fraud and was not an actual contractual obligation with a legitimate counterparty but was instead a vehicle for the fraud committed by Plethico.

h.  Plethico's arrangement of a token shipment of equipment to be sent from Gansons to Old Natrol during the bankruptcy sale process to give the false impression to potential buyers that FTIL would perform under the Fabtech Contract.  These statements and actions were materially false and misleading when made because Plethico knew that the Fabtech contract was in fact a fraud and was not an actual contractual obligation with a legitimate counterparty but was instead a vehicle for the fraud committed by Plethico.

i.  At the behest of Plethico, in connection with that deceptive equipment shipment, the misrepresentations by a Plethico agent in the invoice attached to an August 11, 2014 email from the fictitious "Sanjay Sethi" of "Fabtech" identity that $3,237,300 had been paid by FTIL for the Gansons equipment as part of its performance under the Fabtech Contract. These statements were materially false and misleading when made because the agent of Plethico knew that the Fabtech contract was in fact a fraud and was not an actual contractual obligation with a legitimate counterparty but was instead a vehicle for the fraud committed by Plethico.

j.  The misrepresentation Plethico caused Old Natrol to make in the Debtors' Schedules in the bankruptcy proceedings, listing in Schedule B to Old Natrol's Schedules of Assets and Liabilities among "Prepaid Expenses" a "Prepayment for New Warehouse Project" in the amount of $25,000,000.00 with vendor "Fabtech International Limited/Coutts & Co." (Bk. D.I. 350.)  This statement was materially false and misleading when made because Plethico knew that the Fabtech contract was in fact a fraud

and was not an actual contractual obligation with a legitimate counterparty but was instead a vehicle for the fraud committed by Plethico.

k.  The falsified "Delivery Agreement" sent by the fictitious "Sanjay Sethi" to Old Natrol on October 30, 2014, which purported to be on FTIL's behalf, bear FTIL's corporate seal, and claim that FTIL remained fully obligated to perform under the Fabtech Contract.  These statements were materially false and misleading when made because Plethico knew that the Fabtech contract was in fact a fraud and was not an actual contractual obligation with a legitimate counterparty but was instead a vehicle for the fraud committed by Plethico.

l.  The September 2014 Squar Milner memorandum erroneously concluding, as a result of the misrepresentations by Plethico identified in this Complaint, that the "Fabtech project will provide substantial benefits to Natrol."  This memorandum, along with the Fabtech Contract, various drawings purportedly related to the Fabtech Contract, and other false and misleading documents and emails identified in this Complaint, were posted on a data site for potential buyers of Old Natrol's assets including New Natrol, with Plethico's knowledge via information provided to its installed agent and representative on Old Natrol's board, Dhikle.  These documents and statements were materially false and misleading when made because Dhikle, as an agent of Plethico, knew that the Fabtech Contract was in fact a fraud and was not an actual contractual obligation with a legitimate counterparty but was instead a vehicle for the fraud committed by Plethico.

275.    At the time Plethico made or caused to be made the above and other material misrepresentations and fraudulent nondisclosures, Plethico knew that they were materially false and misleading.

276.    At the time Plethico made or caused to be made the above and other material misrepresentations, New Natrol was unaware of their falsity and believed them to be true.

277.    Plethico knew and intended that potential buyers such as New Natrol would rely on such material misrepresentations and omissions and the feigned legitimacy of the Fabtech Contract.

278.    Plethico made the above and other material misrepresentations and omissions intentionally, willfully, fraudulently, and for the purpose of deceiving potential buyers such as New Natrol in order to induce them to pay more for Old Natrol's assets—including the Fabtech Contract itself—for the Plethico Defendants' benefit as Old Natrol's ultimate equity interest holders.

279.    The Plethico Defendants had a duty not to make materially false and misleading statements and to disclose the truth about the Fabtech Contract to New Natrol.

280.    In reasonable reliance on Plethico's material misrepresentations and fraudulent nondisclosures, New Natrol was damaged by its purchase of Old Natrol's assets, including the Fabtech Contract, in an amount in excess of what Old Natrol would have paid had Plethico disclosed the true facts relating to the Fabtech Contract.

281.    As a direct and proximate result of Plethico's material misrepresentations and fraudulent nondisclosures, New Natrol suffered millions of dollars in damages, including, but not limited to, damages arising from its purchase of the Fabtech Contract, a worthless asset, in an amount to be proven at trial.

282.    PGH and PUSH, together the direct owners of Old Natrol, were the vehicle through which Plethico installed Dhikle and Patel into positions of control in Old Natrol so that Plethico could profit from its fraud in connection with the Fabtech Contract and obtain an inflated price for the Old Natrol assets with the intent that the excess price paid be distributed to Plethico.

283.     Although Plethico has acknowledged that it is the "sole equity holder" of Old Natrol and "stands to receive any funds remaining after unsecured creditors are paid in full," Plethico will do so through its intermediate alter ego subsidiaries, PGH and PUSH.  In the interests of justice, Plethico should not be allowed to insulate itself from damages by funneling any distribution under a plan of liquidation through intermediate, alter ego subsidiaries such as PGH and PUSH.

284.     Plaintiff seeks compensatory and/or other damages, in an amount to be proven at trial.

285.     The Plethico Defendants' fraudulent conduct, including, but not limited to, its numerous material misrepresentations and nondisclosures, was malicious, oppressive, and fraudulent, so as to justify an award of punitive damages.  Plaintiff seeks an award of punitive damages.

286.     To ensure that New Natrol has an adequate remedy, and to prevent the Plethico Defendants from becoming further unjustly enriched by their fraud, New Natrol seeks temporary and preliminary injunctive relief enjoining Plethico, Old Natrol and all others acting in concert with them or at their direction, including but not limited to any bank or holder of accounts of the Debtors, from transferring any funds to any person or entity, there is a material risk that Plethico will cause Old Natrol to transfer assets to offshore Plethico accounts or other persons leaving New Natrol (and Old Natrol creditors) without a remedy.

## SEVENTH CLAIM FOR RELIEF

**Violation of 18 U.S.C. § 1962(c) (Racketeer Influenced and Corrupt Organizations)**
**Against the Plethico Defendants**

287.     New Natrol incorporates herein all foregoing paragraphs of this Complaint.

288.     Old Natrol and New Natrol are persons within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

289.     Plethico, PGH, and PUSH are "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

290.     At all relevant times, the Plethico Defendants were "persons" that existed separate and distinct from the RICO enterprise, described below.

**A.     The RICO Enterprise**

291.     At all relevant times, Old Natrol was a legal corporation that constitutes an "enterprise" as that term is defined in 18 U.S.C. §§ 1961(4) and 1962(c).

292.     Old Natrol was engaged in, and its activities, including those directly at issue in this case, affected interstate commerce.  Old Natrol was (and New Natrol is) a leading vitamin and nutritional supplement manufacturer whose products are distributed and sold throughout the world.  Further, its dealings with Plethico at issue in this litigation involved numerous uses of interstate and international wires in interstate and foreign commerce in furtherance of the offenses alleged herein.

293.     Old Natrol was founded in 1980, and for more than 25 years prior to its acquisition by Plethico operated as a diversified nutrition company manufacturing and marketing premium-branded nutritional products.  At all times relevant to the allegations herein, Old Natrol was headquartered in Chatsworth, California.

294.     As a public company headquartered in California prior to its acquisition by the Plethico Defendants in 2007, Natrol marketed more than 200 nutritional products designed to meet a wide range of consumer needs.  The products were available at more than 50,000 food, drug, mass market and independent health food stores, catalogs and Internet sites, gyms, and specialty stores both in the United States and in foreign countries.

295.     Immediately prior to its acquisition by Plethico, an Indian pharmaceutical company, Old Natrol reported $57.5 million in net sales and $24.1 million in gross profits for the nine months ended September 30, 2007 (increases of 16.9% and 16.1% over the same period in the previous year, respectively).

60

296.    Plethico acquired Old Natrol for approximately $80 million in a general tender offer and cash-out merger announced in November 2007 and completed in December 2007.

297.    Following its acquisition in 2007, the Plethico Defendants used their influence and control to infiltrate Old Natrol to conduct its affairs through a pattern of racketeering activity relating to the Fabtech Contract.

298.    The Plethico Defendants conducted and willingly participated in the enterprise by installing C. Patel, who is Plethico's current CEO and a director of Plethico (and also the son of S. Patel, Plethico's Chairman and Managing Director) as Old Natrol's CEO by designation, and placing both C. Patel and Dhikle on Old Natrol's board of directors.  This placed Plethico's agents in a unique position to manipulate Old Natrol on behalf of Plethico, overseeing and managing its operations in a way that permitted Plethico to infiltrate it and use it as a vehicle for illicit purposes.

299.    In particular, Defendants directed and controlled the activities of Old Natrol through a pattern of racketeering activity in violation of 18 U.S.C. §  1962(c) in order to fraudulently obtain control of the proceeds of the funds borrowed by Old Natrol from Cerberus.

300.    Indeed, it was C. Patel and Dhikle, acting on behalf of the Plethico Defendants, who played the most direct roles in manipulating Old Natrol into swiftly executing the bogus Fabtech Contract and transferring $25 million of Old Natrol's funds into a foreign bank account of Plethico's choosing and for Plethico's benefit.

301.    The Plethico Defendants further conducted and willingly participated in the enterprise by concealing the fraudulent and fictitious nature of the Fabtech Contract in the months and years following its "execution," including throughout Old Natrol's bankruptcy proceeding, repeatedly stonewalling, misleading, and outright lying in attempt to conceal their wrongful conduct.

61

302.    The primary purpose of the Plethico Defendants' use of the enterprise was to siphon as much of the funds borrowed from Cerberus out of Old Natrol as possible without detection, direct it covertly to Plethico, and further conceal the theft through a pattern of racketeering in violation of 18 U.S.C. § 1962(c).

303.    To achieve this purpose, the Plethico Defendants used fraudulent and illegal means, which included, but were not limited to, numerous predicate acts of wire fraud, in violation of 18 U.S.C. § 1343, and fraud in connection with a bankruptcy proceeding, in violation of 18 U.S.C. § 152(8).

**B.    Pattern of Racketeering Activity**

304.    The pattern of racketeering activity, as defined in 18 U.S.C. §§ 1961(1) and 1961(5), occurred over a substantial period of time, beginning no later than February 28, 2013, spanning more than two years, and continuing to this day.

305.    These predicate acts are all related to each other and to the purpose of siphoning as much money out of Old Natrol as possible without detection and directing that money covertly to the Plethico Defendants.

***Pattern of Racketeering Activity:  Multiple Instances of Wire Fraud in Violation of 18 U.S.C. § 1343***

306.    New Natrol incorporates herein all foregoing paragraphs of this Complaint.

307.    Among the predicate acts that constitute "racketeering activity" under 18 U.S.C. § 1961(1) is "any act which is indictable under [18 U.S.C.] section 1343 (relating to wire fraud)."

308.    As described herein, in furtherance of its RICO scheme, the Plethico Defendants engaged in multiple acts of wire fraud in violation of 18 U.S.C. § 1343. Specifically, the Plethico Defendants knowingly and with intent to defraud, devised, participated in, and executed a scheme to defraud Old Natrol as to material matters, and to obtain money and property from Old Natrol by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts,

62

specifically, by manipulating Old Natrol to enter the Fabtech Contract and wire $25 million to an overseas bank account under the Plethico Defendants' control, and to cover-up the fraudulent scheme thereafter.

309.   The Plethico Defendants' scheme involved numerous materially false and fraudulent pretenses, representations, and promises, including:

  a.   The misrepresentation that FTIL was a true counterparty to the contract.

  b.   The misrepresentation that FTIL would perform under the contract.

  c.   The misrepresentation that A.A. Usmani, FTIL's Executive Director, executed the Fabtech Contract on FTIL's behalf.

  d.   The misrepresentation in Paragraph 7.14 of the Fabtech Contract that the contract "is binding and enforceable against FTIL in accordance with its terms, and that no other signature of any party is necessary to make this Contract binding on and enforceable against FTIL."

  e.   The misrepresentation that FTIL maintained bank accounts at Coutts, including account numbers XXXX5555 and XXXX9596.

  f.   The misrepresentation in the preamble of the Fabtech Contract that the "Fabtech Technologies International Limited" with whom Old Natrol was contracting was "registered under the laws of Singapore."

  g.   The misrepresentation in the Fabtech Contract that FTIL had an office in Singapore, specifically, "6 Temasek Bouleverd [sic] #24-01 Suntec Tower, 4038986 Singapore."

  h.   The misrepresentation in Paragraph 4.0 of the Fabtech Contract that FTIL "is skilled in the professional callings necessary to perform the Services and acknowledges that Natrol, not being skilled in such matters, is relying upon the skill and knowledge of FTIL."

63

i.   The false promise and misrepresentation in Paragraph 4.0 of the Fabtech Contract that "FTIL shall perform the Services under this Contract in accordance with the professional standard and quality which prevails among reputable, well-qualified, nationally recognized, licensed design/build general contracting, architectural and engineering firms performing services of the nature and in the locations encompassed within this Contract."

j.   The misrepresentation in Paragraph 7.14 of the Fabtech Contract that FTIL "is legally empowered to provide all of the Services required by this Contract in the states in which the Project is and will be located and the states in which all Services will be performed."

k.   The false promise and misrepresentation in Paragraph 7.14 of the Fabtech Contract that FTIL "shall, at its sole cost and expense, keep in full force and effect all professional and business permits, licenses and approvals affecting FTIL's ability to perform the Services and otherwise necessary and appropriate to enable FTIL to perform this Contract, including, without limitation, all professional licenses and qualifications of any individual employees of FTIL providing services under this Contract or any other Contract Documents."

l.   Misrepresentations throughout the Fabtech Contract that FTIL had a then-present intention to perform under the contract, which performance, under Paragraph 1.1 of the contract, was to include "location selection, evaluation, design, development, Construction, start-up, testing of New Natrol Facility, the design, engineering, procurement, assembly, installation, testing, calibration and validation of manufacturing, Packing, distribution, Utility generation, Distribution equipment, systems, all materials, handling equipment systems, including, without limitation,

64

refrigeration and specialized heating, ventilation and air conditioning

equipment and systems necessary for the operation of the Facility."

310.    The Plethico Defendants continue executing the fraudulent scheme today,

persisting in defrauding New Natrol and this Court during the bankruptcy process.

Indeed, during the Court-supervised sale of Old Natrol, the Plethico Defendants used the

dummy Fabtech Yahoo accounts, purportedly associated with the real FTIL, to give the

appearance during Old Natrol's bankruptcy case that the real FTIL intended to perform

under the contract.

311.    The Plethico Defendants knowingly transmitted and caused to be

transmitted by means of wire communication in interstate and foreign commerce multiple

communications for the purpose of executing this scheme.

312.    While the extent of the Plethico Defendants' uses of interstate and

international wires in furtherance of the scheme will be revealed by discovery in this

action, they include at least the following:

     a.    Email from Dhikle on March 5, 2013, transmitted from his

Plethico account through Plethico's servers in India over international wires

to C. Patel in the United States, attaching the Fabtech Contract;

     b.    Email from Dhikle on March 6, 2013, transmitted from his

Plethico account through Plethico's servers in India over international wires

to C. Patel in the United States, attaching a copy of the Fabtech Contract

purportedly signed by a representative of FTIL;

     c.    Wire transfer of $25 million on March 6, 2013, from Old Natrol

in the United States, transmitted over interstate and international wires, to

overseas bank accounts, account numbers XXXX5555 and/or XXXX9596,

held at Coutts in Singapore, as directed by Plethico;

     d.    Email from C. Patel on March 12, 2013, transmitted from his

Plethico account through Plethico's servers in India over international wires

to Khudagulyan in the United States, attaching (1) a purported "plant layout from fabtech" and (2) a March 8, 2013 letter on Fabtech letterhead titled "Preliminary Plant Layout Option for New Natrol Facility";

e. Email from C. Patel on April 30, 2013, transmitted from his Plethico account through Plethico's servers in India over international wires to Khudagulyan in the United States;

f. Email from Dhikle on June 28, 2014, transmitted from his Plethico account through Plethico's servers in India, over international wires to Milner in the United States, claiming that he (Dhikle) had "limited info on Fabtech . . . as I don't know anything about [the] project";

g. Email from Dhikle on July 1, 2014, transmitted from his Plethico account through Plethico's servers in India, over international wires to Milner in the United States, discouraging further inquiries regarding the Fabtech Contract in an effort to conceal the fraudulent acts alleged herein;

h. Email purportedly from "Sanjay Sethi" on July 23, 2014, using the fabtechprojects@yahoo.com account, sent from the .50 IP address associated with Plethico in India over international wires to four members of Old Natrol's management in the United States, purporting to provide a status report from FTIL;

i. Email purportedly from "Sanjay Sethi" on August 11, 2014, using the fabtechprojects@yahoo.com account, sent from the .50 IP address associated with Plethico in India over international wires to Milner and others in the United States, purporting to introduce another FTIL representative;

j. Email purportedly from "Sanjay Sethi" on September 2, 2014, using thefabtechprojects@yahoo.com account, sent from the .50 IP address

associated with Plethico in India over international wires to a BDO representative in the United States, purporting to confirm that the Fabtech Contract was still in force;

k.  Email from Dhikle on September 1, 2014, transmitted from his Plethico account through Plethico's servers in India over international wires to Milner in the United States, claiming that he had limited ability to control FTIL;

l.  Email purportedly from "Sanjay Sethi" on August 11, 2014, using the fabtechprojects@yahoo.com account, sent from the .50 IP address associated with Plethico in India over international wires to Milner and others in the United States, attaching a purported bill of lading, invoice, and packing lists relating to a shipment of equipment being sent from India to Old Natrol in California;

m.  Email purportedly from "Sanjay Sethi" on August 21, 2014, using the fabtechprojects@yahoo.com account, sent from the .50 IP address associated with Plethico in India over international wires to Milner and others in the United States, claiming that a shipment of equipment was on its way from India to Old Natrol in California;

n.  Email purportedly from "Sanjay Sethi" on September 25, 2014, using the fabtechprojects@yahoo.com account, sent from the .50 IP address associated with Plethico in India over international wires to Milner and others in the United States, and claiming that "Once the shipment is cleared & delivered, our Team of Engineers from Manufacturer will be reaching for installation of equipments [sic]."

313.    The Plethico Defendants participated in the scheme knowingly, willfully, and with the specific intent to profit from manipulating Old Natrol in connection with the Fabtech Contract, in violation of 18 U.S.C. § 1343.

***Pattern of Racketeering Activity: Fraud in Connection with a Bankruptcy Proceeding in Violation of 18 U.S.C. § 152(8)***

314.    New Natrol incorporates herein all foregoing paragraphs of this Complaint.

315.    Among the predicate acts that constitute "racketeering activity" under 18 U.S.C. § 1961(1) is "any offense involving fraud connected with a case under title 11." Under 18 U.S.C. § 152(8), any person who, "after the filing of a case under title 11 or in contemplation thereof, knowingly and fraudulently conceals, destroys, mutilates, falsifies, or makes a false entry in any recorded information (including books, documents, records, and papers) relating to the property or financial affairs of a debtor" shall be guilty of a felony.

316.    Old Natrol filed a petition for relief under Chapter 11 on June 11, 2014.

317.    The Plethico Defendants were aware of and participated in Old Natrol's bankruptcy proceeding.

318.    During the pendency of Old Natrol's bankruptcy proceeding, and in connection therewith, Old Natrol, its agents and representatives, its creditors, and potential buyers attempted to identify and ascertain the full extent and value of Old Natrol's assets and liabilities.

319.    In connection therewith, the Plethico Defendants knowingly and fraudulently falsified numerous documents and entries in recorded information relating to the property and affairs of Old Natrol with the intent to deceive Old Natrol, its agents and representatives, its creditors, and potential buyers.

320.    The documents and entries Plethico falsified relating to the property and financial affairs of Old Natrol during the pendency of Old Natrol's bankruptcy proceedings included, but were not limited to, the following:

a. Plethico's causing Old Natrol to misrepresent the Fabtech Contract in the Debtors' Schedules in the bankruptcy proceedings, listing in Schedule B to Old Natrol's Schedules of Assets and Liabilities among "Prepaid Expenses" a

"Prepayment for New Warehouse Project" in the amount of $25,000,000.00 with vendor "Fabtech International Limited/Coutts & Co."  (Bk. D.I. 350.)

b.    A document entitled "Project Status Report.pdf" sent by "Sanjay Sethi," at the direction of Dhikle and purportedly on behalf of FTIL, to Old Natrol's management on July 23, 2014.  This document, which falsely bore the logo of the real FTIL and purportedly provided an update regarding the status of the construction project contemplated by the Fabtech Contract, was fabricated and transmitted by Plethico to Old Natrol and its representatives in a fraudulent attempt to give the Fabtech Contract the appearance of legitimacy;

c.    A bill of lading sent by "Sanjay Sethi" on August 11, 2014 to Old Natrol and its representatives, falsely indicating that FTIL had arranged for the shipment of equipment from Gansons to Old Natrol in a fraudulent attempt to give the Fabtech Contract the appearance of legitimacy;

d.    Packing lists sent by "Sanjay Sethi" on August 11, 2014 to Old Natrol and its representatives, falsely indicating that FTIL had arranged for the shipment of equipment from Gansons to Old Natrol in a fraudulent attempt to give the Fabtech Contract the appearance of legitimacy;

e.    An invoice sent by "Sanjay Sethi" on August 11, 2014 to Old Natrol and its representatives, falsely bearing the logo and corporate seal of FTIL and falsely indicating that FTIL had arranged for the shipment of equipment from Gansons to Old Natrol in a fraudulent attempt to give the Fabtech Contract the appearance of legitimacy;

f.    A Delivery Agreement sent by "Sanjay Sethi" to Old Natrol, falsified to appear as if it were originating with FTIL and bearing a stamp purporting to be FTIL's corporate seal, in which "Sanjay Sethi" falsely represented that "Fabtech" remained fully obligated to perform under the Fabtech Contract.

g.  Documents displayed on a data site for potential buyers in the

bankruptcy proceeding of Old Natrol's assets including New Natrol, including the

September 2014 Squar Milner memorandum erroneously concluding that the

"Fabtech project will provide substantial benefits to Natrol," the Fabtech Contract,

various drawings purportedly related to the Fabtech Contract, and other false and

misleading documents and emails identified in this Complaint

321.    These documents and entries in recorded information were falsified by the

Plethico Defendants to give the impression that the Fabtech Contract was legitimate and

would be performed, in violation of 18 U.S.C. § 152(8).

322.    As a result of the above falsified information, during Old Natrol's

bankruptcy case and the Court-supervised sale process, the Fabtech Contract appeared to

be a legitimate asset with appreciable rights and deliverables (and therefore worth its $25

million cost), when in truth and in fact, it was fraudulent and worthless.

C.    **Injury and Causation**

323.    As alleged above, Old Natrol was injured in its business and property by

reason of the above RICO violations by the Plethico Defendants, including, among other

things, having been defrauded into paying $25 million in connection with the Fabtech

Contract for essentially nothing in return and having been forced into bankruptcy.  New

Natrol, as assignee of all claims held by Old Natrol relating to the Fabtech Contract, now

brings the instant claim for relief for damages caused by the Plethico Defendants in

amount to be proven at trial.

324.    Further, New Natrol was injured in its business and property by reason of

the above RICO violations by the Plethico Defendants, including, among other things, by

its purchase of Old Natrol's assets, including the Fabtech Contract, in an amount in excess

of what Old Natrol would have paid had Plethico disclosed the true facts relating to the

Fabtech Contract.

325.    As remedy for the Plethico Defendants' RICO violations, New Natrol prays for treble damages to the maximum extent allowable pursuant to 18 U.S.C. § 1964(c), costs and attorneys' fees, pursuant to 18 U.S.C. § 1964(c), and for all other relief justified under the circumstances.

326.    PGH and PUSH, together the direct owners of Old Natrol, were the vehicle through which Plethico installed Dhikle and Patel into positions of control in Old Natrol so that Plethico could undertake the fraud in connection with the Fabtech Contract.

327.    Although Plethico has acknowledged that it is the "sole equity holder" of Old Natrol and "stands to receive any funds remaining after unsecured creditors are paid in full," Plethico will do so through its intermediate alter ego subsidiaries, PGH and PUSH.  In the interests of justice, Plethico should not be allowed to insulate itself from damages by funneling any distribution under a plan of liquidation through intermediate, alter ego subsidiaries such as PGH and PUSH.

328.    To ensure that New Natrol has an adequate remedy, and to prevent the Plethico Defendants from becoming further unjustly enriched by their fraud, New Natrol seeks temporary and preliminary injunctive relief enjoining Plethico, Old Natrol and all others acting in concert with them or at their direction, including but not limited to any bank or holder of accounts of the Debtors, from transferring any funds to any person or entity, there is a material risk that Plethico will cause Old Natrol to transfer assets to offshore Plethico accounts or other persons leaving New Natrol (and Old Natrol creditors) without a remedy.

## EIGHTH CLAIM FOR RELIEF

### Intentional Fraudulent Transfer under 11 U.S.C. § 548(a)(1)(A)
### Against the Plethico Defendants

329.    New Natrol incorporates herein all foregoing paragraphs of this Complaint.

71

330.    Old Natrol incurred obligations under the Fabtech Contract and made the attendant $25 million payment to bank accounts as directed by Plethico within two years of June 11, 2014, the date on which Old Natrol filed petitions for relief under Chapter 11 of the Bankruptcy Code.

331.    The Plethico Defendants, by and through their employees, officers, directors, agents, and affiliates, caused Old Natrol to incur the obligations in the Fabtech Contract and transfer $25 million to bank accounts as directed by Plethico with the actual intent to hinder, delay, and defraud Old Natrol and its creditors, which intent is demonstrated by, among other things:

a.    Their knowledge that the purported "Fabtech" counterparty to the Fabtech Contract was not a real entity but was instead a fiction created by Plethico to resemble FTIL, without FTIL's authorization or knowledge.

b.    Their knowledge that the purported "Fabtech" counterparty to the Fabtech Contract was not a real entity and thus had no skills or knowledge whatsoever in the professional callings necessary to perform under the Fabtech Contract.

c.    Their knowledge that FTIL had not approved and indeed had no knowledge of the Fabtech Contract.  FTIL further never authorized Plethico to act on its behalf, contract in its name, or otherwise use the "Fabtech" name and logo.  The person purporting to execute the Fabtech Contract on FTIL's behalf was not authorized to act and was not acting on behalf of FTIL.

d.    Their knowledge that bank accounts associated with account numbers XXXX5555 and XXXX9596 at Coutts in Singapore, to which Plethico directed Old Natrol to wire $25 million in connection with the Fabtech Contract, were in no way connected to FTIL, but rather were accounts used by Plethico to further its fraud.

72

e.   Their knowledge that A.A. Usmani, FTIL's Executive Director, never executed the Fabtech Contract on FTIL's behalf; rather, the signature purporting to be his was a forgery undertaken by or at the behest of Plethico.

f.   Their knowledge that FTIL had no office at "6 Temasek Bouleverd [sic] #24-01 Suntec Tower, 4038986 Singapore," and indeed has never held any office in Singapore.

g.   Their knowledge that the funds Old Natrol used to make the $25 million prepayment on the Fabtech Contract had become available under the Cerberus Financing the very day the Fabtech Contract was entered and just days before the attendant $25 million prepayment.

h.   The fact that a $25 million prepayment on the entirety of the Fabtech Contract made no commercial sense and was not in the ordinary course of business for Old Natrol.

i.   The fact that Plethico undertook a concerted and protracted effort to conceal the fact that the Fabtech Contract was a hoax, including by falsely impersonating Fabtech personnel in communications with Old Natrol and its representatives, both pre- and post-petition.

j.   The fact that Old Natrol effectively received no value whatsoever in exchange for its $25 million prepayment in connection with the Fabtech Contract.

k.   The insider relationship of the Plethico Defendants vis-à-vis Old Natrol as Old Natrol's parent companies.

l.   The insider relationship of the Plethico Defendants vis-à-vis Old Natrol by virtue of the fact that Plethico's General Counsel Dhikle and Plethico's current CEO, C. Patel, who is also the son of Plethico's Chairman S. Patel, were placed by the Plethico Defendants as Old Natrol's

73

directors (Dhikle and C. Patel) and CEO (C. Patel) and thus were in a

unique position to manipulate Old Natrol on behalf of the Plethico

Defendants in connection with the Fabtech Contract.

332.    As a result of the foregoing, New Natrol demands the entry of a judgment

avoiding the Fabtech Contract and the attendant $25 million wire to bank accounts as

directed by Plethico in connection therewith and the recovery of same pursuant to Section

548 of the Bankruptcy Code.

## NINTH CLAIM FOR RELIEF

**Intentional Fraudulent Transfer under 11 U.S.C. § 544(b) and Cal. Civ. Code
§§ 3439.04(a) and 3439.07
Against the Plethico Defendants**

333.    New Natrol incorporates herein all foregoing paragraphs of this Complaint.

334.    Old Natrol incurred obligations under the Fabtech Contract and made the

attendant $25 million payment to bank accounts as directed by Plethico within two years

of June 11, 2014, the date on which Old Natrol filed petitions for relief under Chapter 11

of the Bankruptcy Code.

335.    The Plethico Defendants, by and through their employees, officers,

directors, agents, and affiliates, caused Old Natrol to incur the obligations in the Fabtech

Contract and transfer $25 million to bank accounts as directed by Plethico with the actual

intent to hinder, delay, and defraud Old Natrol and its creditors, which intent is

demonstrated by, among other things:

    a.    Their knowledge that the purported "Fabtech" counterparty to

the Fabtech Contract was not a real entity but was instead a fiction created

by Plethico to resemble FTIL, without FTIL's authorization or knowledge.

    b.    Their knowledge that the purported "Fabtech" counterparty to

the Fabtech Contract was not a real entity and thus had no skills or

74

knowledge whatsoever in the professional callings necessary to perform under the Fabtech Contract.

c.   Their knowledge that FTIL had not approved and indeed had no knowledge of the Fabtech Contract.  FTIL further never authorized Plethico to act on its behalf, contract in its name, or otherwise use the "Fabtech" name and logo.  The person purporting to execute the Fabtech Contract on FTIL's behalf was not authorized to act and was not acting on behalf of FTIL.

d.   Their knowledge that bank accounts associated with account numbers XXXX5555 and XXXX9596 at Coutts in Singapore, to which Plethico directed Old Natrol to wire $25 million in connection with the Fabtech Contract, were in no way connected to FTIL, but rather were accounts used by Plethico to further its fraud.

e.   Their knowledge that A.A. Usmani, FTIL's Executive Director, never executed the Fabtech Contract on FTIL's behalf; rather, the signature purporting to be his was a forgery undertaken by or at the behest of Plethico.

f.   Their knowledge that FTIL had no office at "6 Temasek Bouleverd [sic] #24-01 Suntec Tower, 4038986 Singapore," and indeed has never held any office in Singapore.

g.   Their knowledge that the funds Old Natrol used to make the $25 million prepayment on the Fabtech Contract had become available under the Cerberus Financing the very day the Fabtech Contract was entered and just days before the attendant $25 million prepayment.

h.   The fact that a $25 million prepayment on the entirety of the Fabtech Contract made no commercial sense and was not in the ordinary course of business for Old Natrol.

75

i.   The fact that Plethico undertook a concerted and protracted effort to conceal the fact that the Fabtech Contract was a hoax, including by falsely impersonating Fabtech personnel in communications with Old Natrol and its representatives, both pre- and post-petition.

j.   The fact that Old Natrol effectively received no value whatsoever in exchange for its $25 million prepayment in connection with the Fabtech Contract.

k.   The insider relationship of the Plethico Defendants vis-à-vis Old Natrol as Old Natrol's parent companies.

l.   The insider relationship of the Plethico Defendants vis-à-vis Old Natrol by virtue of the fact that Plethico's General Counsel Dhikle and Plethico's current CEO, C. Patel, who is also the son of Plethico's Chairman S. Patel, were placed by the Plethico Defendants as Old Natrol's directors (Dhikle and C. Patel) and CEO (C. Patel) and thus were in a unique position to manipulate Old Natrol on behalf of the Plethico Defendants in connection with the Fabtech Contract.

336.   As a result of the foregoing, New Natrol demands the entry of a judgment avoiding and recovering the $25 million wire transfer made by Old Natrol to bank accounts as directed by Plethico in connection with the Fabtech Contract.

337.   Pursuant to Sections 3439.04(a) and 3439.07 of the California Civil Code, as applicable under 544(b) of the Bankruptcy Code, the Court should issue (i) a right to attach Order and a writ of attachment imposing a lien on any distribution to be made by Old Natrol to the Plethico Defendants or any assignee through a plan of liquidation or otherwise on account of the Plethico Defendants' equity interest in Old Natrol and (ii) provisional injunctive relief enjoining Plethico, Old Natrol and all others acting in concert with them or at their direction, including but not limited to any bank or holder of accounts of the Debtors, from transferring any funds to any person or entity, there is a material risk

76

that Plethico will cause Old Natrol to transfer assets to offshore Plethico accounts or other persons leaving New Natrol (and Old Natrol creditors) without a remedy.

## TENTH CLAIM FOR RELIEF

### Constructive Fraudulent Transfer under 11 U.S.C. § 548(a)(1)(B)
### Against the Plethico Defendants

338.    New Natrol incorporates herein all foregoing paragraphs of this Complaint.

339.    Old Natrol incurred the obligations under the Fabtech Contract and made the attendant $25 million payment to bank accounts as directed by Plethico within two years of June 11, 2014, the date on which Old Natrol filed petitions for relief under Chapter 11 of the Bankruptcy Code.

340.    Old Natrol received less than a reasonably equivalent value in exchange for its incurrence of obligations under the Fabtech Contract and the attendant $25 million wiring from Old Natrol to bank accounts as directed by Plethico under the Fabtech Contract.  Indeed, Old Natrol effectively received nothing in exchange.

341.    As a result of the obligations Old Natrol incurred under the Fabtech Contract and the attendant $25 million payment, Old Natrol was or became insolvent, was left with unreasonably small capital, and was left with debts that would be beyond Old Natrol's ability to pay as such debts matured.

342.    As a result of the foregoing, New Natrol demands the entry of a judgment avoiding the Fabtech Contract and the attendant $25 million wire to bank accounts as directed by Plethico in connection therewith and the recovery of same pursuant to Section 548 of the Bankruptcy Code.

## ELEVENTH CLAIM FOR RELIEF

### Constructive Fraudulent Transfer under 11 U.S.C. § 544(b) and Cal. Civ.
### Code §§ 3439.05 and 3439.07
### Against the Plethico Defendants

343.    New Natrol incorporates herein all foregoing paragraphs of this Complaint.

77

344.    Old Natrol incurred the obligations under the Fabtech Contract and made the attendant $25 million payment to bank accounts as directed by Plethico within two years of June 11, 2014, the date on which Old Natrol filed petitions for relief under Chapter 11 of the Bankruptcy Code.

345.    Old Natrol received less than a reasonably equivalent value in exchange for its incurrence of obligations under the Fabtech Contract and the attendant $25 million wiring from Old Natrol to bank accounts as directed by Plethico under the Fabtech Contract.  Indeed, Old Natrol effectively received nothing in exchange.

346.    As a result of the obligations Old Natrol incurred under the Fabtech Contract and the attendant $25 million payment, Old Natrol was or became insolvent, was left with unreasonably small capital, and was left with debts that would be beyond Old Natrol's ability to pay as such debts matured.

347.    Pursuant to Sections 3439.04(a) and 3439.07 of the California Civil Code, as applicable under 544(b) of the Bankruptcy Code, the Court should issue (i) a right to attach Order and a writ of attachment imposing a lien on any distribution to be made by Old Natrol to the Plethico Defendants or any assignee through a plan of liquidation or otherwise on account of the Plethico Defendants' equity interest in Old Natrol and (ii) provisional injunctive relief enjoining Plethico, Old Natrol and all others acting in concert with them or at their direction, including but not limited to any bank or holder of accounts of the Debtors, from transferring any funds to any person or entity, there is a material risk that Plethico will cause Old Natrol to transfer assets to offshore Plethico accounts or other persons leaving New Natrol (and Old Natrol creditors) without a remedy.

### TWELFTH CLAIM FOR RELIEF

**Liability of Transferee of Avoided Transfer under 11 U.S.C. § 550(a)**
**Against the Plethico Defendants**

348.    New Natrol incorporates herein all foregoing paragraphs of this Complaint.

RLF1 11775832v.1

349.    The Plethico Defendants were the entity for whose benefit the Fabtech Contract and the attendant $25 million wire to bank accounts as directed by Plethico were made, and who in fact received the benefits thereof.

350.    Alternatively, the Plethico Defendants were the immediate or mediate transferee of the Fabtech Contract and the attendant $25 million wire to bank accounts as directed by Plethico and thereby received the benefits thereof.

351.    As a result of the foregoing, New Natrol is entitled to recover the value of the Fabtech Contract and transfer of $25 million from Old Natrol pursuant to Section 550(a) of the Bankruptcy Code, plus interest thereon to the date of payment, and the costs of this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment:

A.    In favor of Plaintiff and against the Plethico Defendants and ordering rescission of the Fabtech Contract and restitution in an amount to be proven at trial, plus pre-judgment interest;

B.    In the alternative, for an award of monetary damages in favor of Plaintiff and against the Plethico Defendants in an amount to be proven at trial;

C.    An award of exemplary and punitive damages in favor of Plaintiff and against the Plethico Defendants in an amount appropriate to punish the Plethico Defendants and deter others from engaging in similar misconduct;

D.    For temporary, provisional, and permanent injunctive relief against all Defendants and any of their affiliates, subsidiaries, agents, employees, officers, directors, servants, employees, partners, custodians, and banks as appropriate to prevent the distribution of Old Natrol estate assets to the Plethico Defendants or an assignee in furtherance of their fraud;

RLF1 11775832v.1

E.      A judgment avoiding and recovering for the benefit of Old Natrol the Fabtech Contract and the $25 million payment;

F.      A writ of attachment imposing a lien on any distribution to be made to the Plethico Defendants or an assignee on account of the Plethico Defendants' equity interest in Old Natrol;

G.      Against the Plethico Defendants, treble damages to the maximum extent permitted by law;

H.      Awarding Plaintiff all reasonable attorneys' fees, costs and disbursements in this action against the Plethico Defendants; and

I.      Other further relief as is just, proper, and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial of all issues in this action triable of right by a jury.

Dated:  April 6, 2015
        Wilmington, Delaware

ROBERT KLYMAN                          ROBERT J. STEARN, JR. (No. 2915)
rklyman@gibsondunn.com                 stearn@rlf.com
CRAIG H. MILLET                        JOHN H KNIGHT (No. 3848)
cmillet@gibsondunn.com                 knight@rlf.com
MICHAEL M. FARHANG                     ROBERT C. MADDOX (No. 5356)
mfarhang@gibsondunn.com                maddox@rlf.com
ERIC D. VANDEVELDE
evandevelde@gibsondunn.com

GIBSON, DUNN & CRUTCHER LLP            RICHARDS, LAYTON & FINGER, P.A.
333 South Grand Avenue                 One Rodney Square, 920 North King St.
Los Angeles, CA  90071-3197            Wilmington, DE 19801
Telephone:    213.229.7000             Telephone:    302.651.7700
Facsimile:    213.229.7520             Facsimile:    302.651.7701

Attorneys for Plaintiff NATROL LLC

RLF1 11775832v.1